UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAUL DAVIS,

Plaintiff

v.

SUFFOLK COUNTY, AND ANDREA CABRAL (in her official capacity),

Defendants

Civil Action No. 04-11851-WGY

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

Pursuant to Local Rule 56.1, Defendants hereby submit the following Statement of Material Facts, each of which they contend is undisputed:

1. Plaintiff Paul Davis ("Mr. Davis") was employed as a jail officer at the Nashua Street Jail from February 20, 1991 to July 15, 2003.

2. Mr. Davis has signed Admissions in this case, a copy of which is attached hereto as Exhibit 1.

3. The 167-page document dated June 23, 2003 entitled *In the Matter of Discipline Hearing of Paul Davis,* is a genuine and accurate copy of the transcript for Mr. Davis' May 2, 2003 disciplinary hearing. Admission No. 53. It is attached hereto as Exhibit 2.

4. The 60-page document introduced as Exhibit 3 at Mr. Davis' May 2, 2003 disciplinary hearing is a genuine and accurate copy of the official court transcript for the testimony Mr. Davis provided in the United States District Court for the District of Massachusetts on March 5, 2003. Admission No. 4. It is attached hereto as Exhibit 3.

5. The 122-page document introduced as Exhibit 4 at Mr. Davis' May 2, 2003 disciplinary hearing is a genuine and accurate copy of the official court transcript for the testimony Mr. Davis provided in the United States District Court for the District

of Massachusetts on March 6, 2003. Admission No. 5. It is attached hereto as Exhibit 4.

6. The Jail is a maximum security facility that houses up to approximately 700 pre-trial detainees. Affidavit of Eugene Sumpter at ¶ 3, attached hereto as Exhibit 5.

7. In the 1998 – 1999 time period there was in excess of 300 custody staff employed at the Jail, including jail officers, corporals, sergeants, lieutenants and captains. Id. at ¶ 5.

8. The chain of command, with which Mr. Davis was familiar, goes from jail officer to corporal to sergeant to lieutenant to captain to Assistant Deputy Superintendent to Deputy Superintendent to Superintendent to Special Sheriff to Sheriff. Exhibit 2 at pp. 100 - 101.

9. There are 13 detainee housing units within the jail, each of which holds between 34 and 64 detainees. Exhibit 5 at ¶ 4.

10. In the 1998 – 1999 time period, the units were staffed with two jail officers. There are typically two housing units connected by a control center, which is staffed by a sergeant. Exhibit 3 at p. 5-6 and Exhibit 5 at ¶ 6.

11. In addition to officers assigned to housing units, there existed a number of SERT ("Sheriff's Emergency Response Team") teams within the Jail. In the 1998 – 199 time period, there were generally three SERT teams (two officers each) assigned to the 7:00 a.m. – 3:00 p.m. shift and also to the 3:00 p.m. – 11:00 p.m. shift. Exhibit 3 at p. 15 – 16 and Exhibit 5 at ¶ 7.

12. SERT teams were responsible for responding to medical emergencies, physical altercations between detainees, altercations between detainees and staff, among other duties. Exhibit 3 at p. 15 lines 1 – 4.

13. Mr. Davis received training in department policies and was familiar with Policy S-505 (Use of Force) and S-220 (Employee General Conduct). Exhibit 3 at p. 6 – 7.

14. Mr. Davis was properly trained in the use of force. Exhibit 2 at p. 111 line 15.

15. Mr. Davis knew the correct way to use force. Id at p. 111 line 17.

16. Mr. Davis was issued an Employee Policy Manual on or about August 4, 1996. Admission No. 1.

17. The Policy Manual Mr. Davis received on or about August 4, 1996 contained a copy of Suffolk County Sheriff's Department policy S-505 (Use of Force). Admission No. 3.

18. The 9-page document introduced as Exhibit 5 at Mr. Davis' May 2, 2003 disciplinary hearing is a genuine and accurate copy of Suffolk County Sheriff's Department Policy S-505 that was issued to Mr. Davis on or about August 4, 1996. Admission No. 6. It is attached hereto as Exhibit 6.

19. This policy [S-505] was in effect in 1998 and 1999. Exhibit 3 at p. 10 lines 19 – 23.

20. Pursuant to SCSD Policy S-505.04:
   - Force must not be continued after the purpose for which it was applied has been accomplished.
   - **Under no circumstances shall an officer use <u>or permit</u> the use of force as a method of punishment or revenge.** (emphasis added).
   - **Under no circumstances shall an officer use <u>or permit</u> the use of excessive force**. (emphasis added). Exhibit 6

21. Reporting requirements for use of force incidents is contained in section .16 of S-505. Exhibit 6 and Exhibit 3 at pp. 12 – 14.

22. The Policy Manual Mr. Davis received on or about August 4, 1996 contained a copy of Suffolk County Sheriff's Department S-220 (Employee General Conduct). Admission No. 2.

23. The 12-page document introduced as Exhibit 6 at Mr. Davis' May 2, 2003 disciplinary hearing is a genuine and accurate copy of Suffolk County Sheriff's Department Policy S-220 that was issued to Mr. Davis on or about August 4, 1996. Admission No. 7. It is attached hereto as Exhibit 7.

24. Pursuant to SCSD Policy S-220.07:
   - When interacting with inmates, employees must act solely in the furtherance of the department's twofold mission: CUSTODY AND CARE (emphasis in original)
   - Employee conduct and interaction with inmates shall provide protection from personal abuse, corporal punishment, personal injury, disease, property damage and harassment.
   - Employee conduct shall be professional in the objective and unbiased application and enforcement of rules and regulations. Exhibit 7.

25. Pursuant to SCSD Policy S-220.12:
   - Employees are required to report in writing all unusual or significant events regarding department operations or security, in which they are involved or about which they have personal knowledge.
   - Officers must report in writing all "use of force" incidents in which they are involved. Exhibit 7.

26. Pursuant to SCSD Policy S-220.14:
   - It is the responsibility of each employee to know, understand and obey the rules and regulations of the department. Exhibit 7.

27. An employee of the department may be disciplined for any violation of department policy including, but not limited to the following offenses:
    - Conduct unbecoming an officer
    - Violation of the law, city ordinance or department policy
    - Violation of the oath of an officer
    - **Submission of a misleading, incorrect or false report** (emphasis added)
    - **Excessive force** (emphasis added)
    - Violation of any other law of the Commonwealth of Massachusetts or the U.S., ordinance or regulation. Exhibit 7.

28. The 2-page document introduced as Exhibit 18 at Mr. Davis' May 2, 2003 disciplinary hearing is a genuine and accurate copy of an examination Mr. Davis took on or about December 5, 1997. Admission No. 8. It is attached hereto as Exhibit 8.

29. In this examination, Mr. Davis demonstrated his knowledge that officers are accountable for the actions they take, even if they acted on direct orders of a supervisor. Exhibit 8 at question 4.

30. As of December 5, 1997, Mr. Davis knew that it was a violation of Suffolk County Sheriff's Department written policy to omit details of the manner and degree of force used when submitting a written report. Admission No. 9.

31. As of December 5, 1997, Mr. Davis knew that the department's written policy mandated that an officer could not use, or permit the use of force when: (a) the force is excessive; (b) the force is used as punishment; or (c) the force is used as revenge. Admission No. 11.

32. The 9-page document introduced as Exhibit 23 at Mr. Davis' May 2, 2003 disciplinary hearing is a genuine and accurate copy of an examination Mr. Davis took on or about February 2, 2001. Admission No. 12. It is attached hereto as Exhibit 9.

33. Through this examination, Mr. Davis again demonstrated his knowledge that officers are accountable for the actions they take, even if they acted on direct orders of a supervisor. Not only did Mr. Davis correctly answer the true/false question that was posed, but he inserted the phrase "everyone is responsible for His or Her own actions" on the test form. Exhibit 9 at question 13.

34. The 9-page document introduced as Exhibit 25 at Mr. Davis' May 2, 2003 disciplinary hearing is a genuine and accurate copy of an examination Mr. Davis took on or about February 5, 2002. Admission No. 13. It is attached hereto as Exhibit 10.

35. Through this examination, Mr. Davis again demonstrated his knowledge that officers are accountable for the actions they take, even if they acted on direct orders of a supervisor. Not only did Mr. Davis correctly answer the true/false question that was posed, but he inserted the phrase "you are accountable for your own actions" on the test form. Exhibit 10 at question 13.

36. In this same examination, Mr. Davis demonstrated his knowledge that officers were not to use or permit the use of force when it was excessive, used as punishment or used as revenge. Id. at question 10.

37. Mr. Davis was a member of SERT during 1998 and 1999, and was assigned to the 3:00 p.m. to 11:00 p.m. shift. Exhibit 3] at p. 15 – 16.

38. Mr. Davis was familiar with the chain of command at the Nashua Street Jail. Exhibit 2 at p. 100 lines15 – p. 101 line 8.

39. At all relevant times there existed a division within the Sheriff's Department that was responsible, among other things, for investigating allegations of staff misconduct – the Sheriff's Investigation Division or "SID". Mr. Davis was aware of SID and understood its role in investigating allegations of misconduct. Exhibit 3 at p. 14 line 4 – 10.

40. Mr. Davis witnessed numerous instances of excessive force against four detainees in 1998 and 1999 during the course of his duties. (Complaint ¶ ¶ 18-19).

41. As to the four instances he cited in his complaint, Mr. Davis stated that force was not justified in any of them and that it was used for "punishment" and "to teach [the detainees] a lesson." Exhibit 2 at p. 92 lines 1 – 9.

42. Mr. Davis provided false reports to the Suffolk County Sheriff's Department concerning each of these instances. Three of his false reports were in writing, and a fourth was made orally to a Department investigator who was investigating one of the instances of excessive force Davis witnessed. (Complaint ¶¶ 20-21).

43. Mr. Davis admits to excluding from his report to this investigator "any improper actions by his fellow officers or his supervisors" and stated that he "exaggerated the actions of the inmate either in answering the investigator's questions or in completing a report made after the interview done at the investigator's specific direction." (Complaint ¶ 21).

44. It was not until Mr. Davis was approached by the Federal Bureau of Investigation and subpoenaed to testify before a grand jury that he began to report the numerous policy violations he had witnessed (excessive force) and participated in (false reports and lying to investigators). Exhibit 4 at pp 4 – 9.

45. In March of 2003, Mr. Davis testified on behalf of the government in a criminal trial in United States District Court for the District of Massachusetts, a case brought against a number of jail officers and mid-level supervisors from the Nashua Street Jail for the use of excessive force against detainees at the Jail and obstruction of justice. (Complaint ¶28). See also Exhibits 3 and 4 generally.

46. On March 17, 2003, another Jail Officer – Brian Murphy – also testified on behalf of the Government in the above criminal trial. Affidavit of Sheriff Andrea Cabral, attached hereto as Exhibit 11.

47. Officer Murphy testified that two other jail officers assaulted a detainee in his cell in the jail's medical unit, and that they falsified their reports about the incident. Id. at ¶ 20.

48. During the assault, Officer Murphy was in the control booth, and, upon seeing the assault, immediately called for a SERT team to respond to the unit. Id.

49. Officer Murphy acknowledged that he wrote a false report in an attempt to cover up the incident. He also lied to SID when questioned about the incident. Id.

50. Officer Murphy admitted that he initially lied to FBI agents when questioned about the incident a year later, but subsequently cooperated with investigators and prosecutors before the Grand Jury and in testifying at trial. Id.

51. Mr. Davis and Officer Murphy each testified after receiving a proffer agreement from the government. Exhibit 4 at p. 5 lines 2 – 3 and Exhibits 12 and 13.

52. It was Mr. Davis' belief that, under this agreement, "anything I said in my testimony couldn't be used against me." Exhibit 4 at p. 5 lines 2 – 3.

53. On cross examination in the criminal trial, Mr. Davis conceded:

> *Q: My question for you is: Everything you testify to, every beating you were involved in, every beating you observed or stood by, every false report that you engaged in, clean slate for you, right?*
>
> *A: As far as prosecution, yes.*
>
> *Q: Okay. And you're also going to get from the government after you step off that stand, it's your expectation that you're going to get a nice letter from someone from the U.S. Attorney's Office to your boss, the sheriff, right?*
>
> *A: Yes.*
>
> *Q: Because it's kind of your expectation that after all of these admissions that you've talked about you may be subject to some discipline by the sheriff.*
>
> *A: Yes.*

*Q: Okay. Not prosecution, not prosecution in indictment for the crimes you've admitted to, but some disciplinary proceeding may come from all of what you've admitted to, right?*

*A: Yes.*

. . .

*Q:* ***So you expect maybe with the help of the United States Government and Attorney Merritt you might just still keep your job, correct?***

***A: That's a possibility, yes.*** Exhibit 4 at p. 52 line 8 – p. 53 line 8. (emphasis added).

54. Subsequent to the trial, Suffolk County Sheriff Andrea Cabral received two letters from United States Attorney Michael Sullivan, one on behalf of Paul Davis, and the other on behalf of Brian Murphy. Exhibit 11 at ¶ 12.

55. A copy of the Davis letter is attached hereto as Exhibit 12. Exhibit 11 at ¶ 12.

56. A copy of the Murphy letter is attached hereto as Exhibit 13. Id.

57. Subsequent to the criminal trial, Davis was suspended from the Department and charged with numerous violations of Department policy based on his admissions of making numerous false reports and lying to investigators. (Complaint ¶ 36). Exhibit 11 at ¶ 14.

58. Officer Murphy was suspended at the same time and also charged with numerous violations of Department policies based on his admissions relative to the one incident described in ¶¶ 47 – 50 above. Exhibit 11 at ¶ 14.

59. Mr. Davis fully expected that he would be subject to discipline subsequent to the criminal trial "because of the admitting to the rules violations, different – you know, the false report, that sort of thing. That being a violation of policy, I – you know, I'd just assume that naturally there would be a [disciplinary] hearing on it." Exhibit 2 at p. 115 lines 10 – 16 and Exhibit 4 at pp 52-53.

60. A large part of Mr. Davis' disciplinary hearing consisted of a representative of the department directing the Hearing Officer's attention to portions of the transcript of the criminal trial exhibiting either knowledge of department policy or admissions to violations of department policy. See generally Exhibit 2 at pp. 1 – 78.

61. Mr. Davis then testified in his own defense at this hearing under oath. Id. at p. 78 line 13.

62. Mr. Davis testified at this disciplinary hearing that he had reviewed the transcripts of his own testimony from the criminal trial, and stated that there was nothing about it that was erroneous or that he wanted to change. Exhibit 2 at p. 80 lines 4 -8.

63. In describing his understanding of an unwritten "code of silence", Mr. Davis stated the following:

> *Officers were always looking out for each other. They wouldn't want to put anything in a report that was going to get another officer in trouble and make – use the way you describe incidents in the report to cover up possible injuries to an inmate. And you know, you'd just say like if he had a bump on his head or something, that he hit his head on a toilet or a bed or something like that inside the cell, to cover up the use of excessive force. Things like that.* Exhibit 2 at p. 88, lines 6 – 14.

64. This was similar to Davis' March 5, 2003 testimony in federal court that:

> *From time to time I would explain away injuries to inmates by saying that they hit their head on an object inside a cell, like a bed or a sink or a wall, things like that, to explain why they may have injuries.* Exhibit 3 at p. 20 lines 11 – 14.

65. Mr. Davis and his attorney were informed twice during this disciplinary hearing that it was based on alleged violations of department policy and not on the fact that Mr. Davis testified at the criminal trial. Exhibit 2 at p. 73 line 18 – p. 74. line 16.

66. In response to questions by the Hearing Officer at his disciplinary hearing, Mr. Davis stated that

> *If I was involved in an incident where I witnessed an officer use excessive force, it was common practice to write the report in such a way that wouldn't get the officer into trouble.* Id. at p. 123 line 24 – p. 124 line 2.

67. At his disciplinary hearing, Mr. Davis was unable to quantify how many false reports he had submitted over the course of his 12 year career. He testified that **"[i]t could have been more than 10. <u>It could have been more than 100</u>. I don't know."** Id. at p. 128 line 22 – p. 129 line 6. (emphasis added).

68. This admission was similar to his trial testimony in which he could not state whether or not he had written more than 10 or 20 or 50 false reports during the course of his career. Exhibit 4 at pp 24 - 25.

69. The following exchange between the Hearing Officer and Mr. Davis also took place during his disciplinary hearing:

> Q: *And let me ask you, sir, did you in every instance in[sic] where you observed an officer doing something wrong, whether it was as minor as spitting on the floor or as extreme as excessive force, did you cover up for that officer?*
>
> A: *In every instance that I was aware of an officer that either by looking the other way or – yeah.*
>
> Q: *Every time?*
>
> A: *Yeah. …* Exhibit 2 at pp. 130 – 131.

70. In explaining his reasoning for failing to report instances of excessive force that he had witnessed, Mr. Davis stated the following:

> *Well, it was – it was part of the whole mind set, you know, the old school method of – and I don't want to say everyone. But I mean, it was just the way things were done. An inmate stepped out of line, and somebody would take care of it. And if you happened to witness that … you wouldn't want to write a report saying that you saw an officer hit an inmate, using excessive force, that type of thing, because then the officer would immediately know that you wrote him up, more or less, and that he was going to get in trouble. Then everybody else knows that you are ratting out this officer. Then, you know, they'd talk about you and you – god knows what could happen. Nobody liked it. I mean,* ***I'm just assuming*** *that all the way up the chain of command, nobody wanted to hear this kind of stuff.* Exhibit 2 at p. 106 line 20 – p. 107 line 10. (emphasis added).

71. Mr. Davis was never threatened with physical harm if he had reported his observations of excessive force. Exhibit 2 at p. 108 line 24 – p. 109 line 1.

72. Mr. Davis conceded at his disciplinary hearing that he made his own decisions concerning the so-called code of silence and covering up incidents which he knew to be wrong, and that that these decisions were contrary to the way he was trained. Id. at p. 139 lines 11 – 20.

73. Subsequent to the Disciplinary Hearing, the Hearing Officer drafted her findings, and presented them to the Sheriff. A copy of the Hearing Officer's findings is attached hereto as Exhibit 14. Exhibit 11 at ¶ 16.

74. The Hearing Officer specifically found, based on his admissions in court and at his disciplinary hearing, that Mr. Davis:

- *On numerous occasions, too many to recount, filed false and misleading incident reports and use of force;*

- *Repeatedly covered up the use of excessive force by other jail officers;*
- *Repeatedly failed to take affirmative actions when officers used excessive force against detainees;*
- *Repeatedly lied to and misled superior officers in his verbal and written reports on incidents involving excessive use of force against detainees;*
- *Lied to SID investigators and interfered in SID investigations into the use of excessive force by officers;*
- *Initially lied to the FBI about his knowledge of involvement in the use of excessive force and cover-up of department policies;*
- *Knowingly and intentionally violated department policies;*
- *Repeatedly covered up for other officers no matter how minor their infractions; and*
- *Never reported the actions of other officers to superior officers who he knew did not approve of or condone the abusive treatment of detainees.* Exhibit 14.

75. The Sheriff determined that given the scope and egregiousness of Davis admitted violations of department policy, that he would be terminated. Exhibit 11 at ¶¶ 17 - 19.

76. Mr. Davis was terminated on July 15, 2003. A copy of Mr. Davis' termination notice is attached hereto as Exhibit 15.

77. The fact that Mr. Davis was disciplined and the level of discipline imposed was based entirely on Davis' admitted policy violations and not at all on the fact that he testified at trial or assisted the authorities in their prosecution of other former jail officers. Exhibit 11 at ¶ 19.

78. The Sheriff determined that Paul Davis was the "antithesis" of what a good correction officer should be. His termination had absolutely nothing to do with his status as an individual who allegedly cooperated with the government and testified at trial. Id..

79. Officer Murphy was not terminated. Instead, through an agreement reached with the employee and his union, he was suspended for a period of six months without pay, and was required to serve a probationary period of three years. Officer Murphy is subject to immediate termination if he ever submits another false report while employed at the Sheriff's Department. Additionally, Officer Murphy was required to discuss his experiences relative to the submission of a false report in department training academies throughout the course of his probation. A copy of Officer Murphy's Settlement Agreement is attached hereto as Exhibit 16. Exhibit 11 at ¶ 22.

80. The Sheriff chose a lengthy unpaid suspension and a probationary period as opposed to termination for Officer Murphy because she determined that while Brian Murphy's actions were egregious, they were far less severe than Paul Davis' admitted offenses. She believed that Brian Murphy was salvageable as an employee. It was imperative to her that Murphy accepted responsibility for his actions, that he be punished severely and that he be required to share his experience with other employees at training so that others could learn from his mistakes. Id.

**The Milliken Incident**

81. On or about April 23, 1999, Mr. Davis observed other jail officers assault detainee Sean Milliken on two separate occasions, and did not report his observations. Admission No. 28.

82. Mr. Davis' report on this incident "omitted the fact the Lt. Sutherland told us to leave Milliken handcuffed after we returned him to his cell. After we left the cell, Milliken repositioned his cuffs from back to front. We returned to his cell, and Lt. Sutherland pushed him down on to the bed and punched him with a closed fist. Officers Nuzzo, Mojica, and Brown entered the cell and began striking Milliken. After everyone left the cell, Milliken began kicking the cell and requesting to see a doctor. Lt. Donnelly then went to the cell with the same officers as before, and they all punched Milliken in the face and head. Kenny Joyner and I then entered the cell and put Milliken in leg irons. Officer Nuzzo offered to write a report for all of us, and said he would leave Lt. Donnelly's name out of it because Lt. Donnelly was already in trouble over other instances of inmate beating." Plaintiff Response to Interrogatory No. 20.

83. The 2-page document introduced as Exhibit 28 at Mr. Davis' May 3, 2003 disciplinary hearing is a genuine and accurate copy of the use of force report Mr. Davis wrote and submitted concerning an April 23, 1999 incident with Sean Milliken on or about April 30, 1999. Admission No. 26. It is attached hereto as Exhibit 17.

84. The 1-page document introduced as Exhibit 29 at Paul Davis' May 3, 2003 disciplinary hearing is a genuine and accurate copy of the use of force narrative Mr. Davis wrote and submitted concerning an April 23, 1999 incident with Sean Milliken on or about April 30, 1999. Admission No. 27. It is attached hereto as Exhibit 18.

85. When questioned by a department investigator about the Milliken incident, Mr. Davis lied, and did not report to the investigator that he had observed staff assault the inmate. Admission No. 29.

86. When he ultimately submitted a written report on the Milliken incident, Mr. Davis did not report that he had observed staff assault the inmate. Admission No. 30.

87. Mr. Davis filed a false report and lied to SID about the Milliken incident to cover up the assault. Admission No. 31.

88. Mr. Davis filed a false report and lied to SID about the Milliken incident to protect himself and other jail officers. Admission No. 32. See also Exhibit 4 at p. 70 line 14 – p. 71 line 17.

89. On or about April 23, 1999, Mr. Davis understood that his failure to report his observations that another officer had assaulted Milliken was a violation of Suffolk County Sheriff's Department written policy. Admission No. 33.

90. On or about April 30, 1999, Mr. Davis understood that his submission of a false report concerning the Milliken incident was a violation of Suffolk County Sheriff's Department written policy. Admission No. 34.

**The Doocey/Ackerly Incident**

91. On or about. April 15, 1999, Mr. Davis observed two jail officers assault William Doocey and failed to report his observations. Admission No. 38.

92. Mr. Davis testified in detail about this incident in federal court. See generally Exhibit 3 at pp. 44 – 51.

93. Mr. Davis had responded to an inmate housing unit based on a report of a fight that had taken place between two detainees, who were later identified as Ackerly and Doocey. Id. at p. 48 lines 13 – 14.

94. After the inmates were placed in handcuffs for escort to a different unit, Davis' supervisor instructed the SERT officers to give the detainees "a tickle", a phrase Davis understood to mean "go upstairs and give them a beating, teach them a lesson." Id. at p. 49 line 24 – p. 50 line 9.

95. Mr. Davis and Officer Cook escorted Doocey to another unit and, once there, instructed the detainee on what to do so they could remove his cuffs. Doocey complied with all instructions, and when the cuffs were removed and the detainee's hands remained on his head, Mr. Davis observed Officer Cook hit Doocey several times in the back and rib cage area. Id at p. 50 lines 17 – 25.

96. Mr. Davis stood by and watched Officer Cook hit inmate Doocey. Mr. Davis made no attempts to stop Cook from assaulting Doocey. Admission No. 39 and Exhibit 3 at p. 51 lines 4 – 5.

97. Mr. Davis then observed another officer – Massucco, enter the cell, step around him and Cook, and smack Doocey in the face. Id at p. 51 lines 20 – 23.

98. The 2-page document introduced as Exhibit 30 at Paul Davis' May 3, 2003 disciplinary hearing is a genuine and accurate copy of a use of force report filed by Paul Davis concerning William Doocey on or about April 15, 1999. Admission No. 37. It is attached hereto as Exhibit 19.

99. On or about April 15, 1999, Mr. Davis understood that his failure to report his observations that another officer had assaulted Doocey was a violation of Suffolk County Sheriff's Department written policy. Admission No. 40.

100. Mr. Davis did not report his observation of Officer Cook assaulting inmate Doocey because he was trying to protect himself and Officer Cook. Exhibit 4 at p. 72 line 14 – 23.

101. On or about April 15, 1999, Mr. Davis understood that his submission of a false or misleading report concerning the Doocey incident was a violation of Suffolk County Sheriff's Department written policy. Admission No. 42.

102. Mr. Davis did not write a report about what had taken place inside the cell with Doocey. Id. at p. 51 lines 24 – 25.

**The Roscoe Incident**

103. Mr. Davis observed another officer assault Reginald Roscoe on multiple occasions on June 15, 1998. Admission No. 17.

104. On or about June 15, 1998, Mr. Davis was assigned to the SERT team and was called to the 2-1 unit of the Jail in response to a matter involving detainee Reginald Roscoe. Exhibit 3 at pp. 21 – 22.

105. Mr. Davis testified about his observations of this incident in detail in federal court. See generally Exhibit 3 at pp 21 -33.

106. He specifically observed another officer (Bethune) push the detainee's head into a wall while escorting him out of the unit, causing his head to bleed. Exhibit 3 at p. 24 lines 15 – 25.

107. The detainee had not been resisting the officer at the time, and Mr. Davis did not see any legitimate reason for this particular use of force. Id. at p. 25 lines 1 – 12.

108. Mr. Davis and this other officer (Bethune) escorted the detainee to the 6-1 unit of the jail, placed him in a cell and proceeded to search him. The detainee was compliant with all instructions during this process. Id. at p. 28 line 10 – p. 29 line 6.

109. Subsequent to this search, Officer Bethune slapped the detainee and knocked him down to the bed and proceeded to hit him in the face area with his fist. The detainee had just been standing there, doing nothing at the time Bethune had assaulted him. Id. at p. 29 line 8 – p. 30 line 4.

110. Subsequent to this incident, Mr. Davis and Officer Bethune conferred on how to write their reports about the incident. They specifically "discussed how to write [their]

reports to explain the use of force that happened inside of that cell … We needed to state a reason why it was necessary to use force inside the cell so we just stated that he was resistive and it was necessary for us to use force on him to control him so we could handcuff him." Id at p. 34 lines 8 – 14.

111. The 2-page document introduced as Exhibit 27 at Mr. Davis' May 3, 2003 disciplinary hearing is a genuine and accurate copy of the disciplinary report Mr. Davis filed against Reginald Roscoe on or about June 15, 1998. It contains false information. Admission No. 14 and 15. It is attached hereto as Exhibit 20.

112. Mr. Davis falsely charged Reginald Roscoe with "actively resisting" to justify another officer's use of excessive force against Roscoe. Admission No. 16.

113. Mr. Davis did not include his observations that another officer assaulted Reginald Roscoe on multiple occasions on June 15, 1998 in his written report. Admission No. 18.

114. Mr. Davis spoke with Thomas Bethune on or about June 5, 1998 and agreed to falsify reports and conceal Bethune's assault upon Reginald Roscoe. Admission No. 19.

115. Mr. Davis did not report his observations that another officer assaulted Roscoe to his shift commander. Admission No. 20.

116. Mr. Davis did not report his observations that another officer assaulted Roscoe to the Deputy Superintendent, the Superintendent, the Special Sheriff, the Sheriff or to any investigator in the Sheriff's Investigation Division. Admission No. 21.

117. On or about June 15, 1998, Mr. Davis understood that his failure to report his observations that another officer had assaulted Roscoe was a violation of Suffolk County Sheriff's Department written policy. Admission No. 22.

118. On or about June 15, 1998, Mr. Davis understood that his submission of a false report concerning the Roscoe incident was a violation of Suffolk County Sheriff's Department written policy. Admission No. 23.

**The Dais Incident**

119. Some time in September of 1999 Mr. Davis became aware of an incident involving jail officer Brian Bailey and inmate Nicholas Dais. Admission No. 45.

120. Mr. Davis, who was assigned to SERT at the time, had a conversation with Officer Bailey at dinner one evening in which Bailey told Davis that he might hear Bailey's man-down alarm go off later. Bailey had explained to him that he was having a problem with a particular detainee. Exhibit 3 at p. 52 line 6 – p. 53 line 12.

121. Approximately one hour after this conversation Mr. Davis heard Bailey's man-down alarm go off. As a result of this, Davis, as a member of SERT, was directed to go to the 5-5 unit, a medical unit of the jail. Upon his arrival there, he observed Bailey inside a cell handcuffing a detainee, later identified as Nikolas Dais. Id. at p. 53 line 13 – p. 54 line 9.

122. Mr. Davis subsequently overheard a conversation between Bailey and Officer Nuzzo, in which they were discussing how to write reports to explain what had just happened. Davis said that Nuzzo suggested they should say that Bailey observed the inmate to be laying on the floor and that when he went in the cell to check on him that the inmate attacked him. Id. at p. 56 lines 4 – 13.

123. Some time subsequent to the incident between Bailey and Dais, Mr. Davis and jail officer Bailey discussed the incident in Mr. Davis' car. Admission No. 46.

124. During the conversation referenced in ¶ 123 above, Bailey stated to Mr. Davis that he [Bailey] had hit Nicholas Dais. Admission No. 47.

125. Mr. Davis' federal court testimony about this conversation was that Bailey told him that "he [Bailey] had a problem with this inmate and himself and Officer Ross went into the cell and basically said beat the fuck out of him." Exhibit 3 at p. 58 lines 2-12.

126. When Mr. Davis first spoke with representatives of the Federal Bureau of Investigation he did not tell them everything exactly because he was still trying to protect jail officer Bailey. Exhibit 4 at p. 77 line 19 – p. 78 line 1 and Admission No. 48.

127. When Mr. Davis first spoke to representatives of the Federal Bureau of Investigation he did not tell them about Bailey's statement in the car referenced above. Admission No. 49.

128. When Mr. Davis first testified before the grand jury, he did not tell them about the conversation in the car with Bailey referenced above. Admission No. 50.

129. In his first appearance at the grand jury, Mr. Davis did not testify about the conversation in the car with Bailey referenced above because he was still trying to protect officer Bailey and did not want to tell anything too damaging. Admission No. 51.

130. When Mr. Davis spoke to representatives of the Federal Bureau of Investigation for the second time he did not tell them the conversation in the car with Bailey referenced above. Exhibit 4 at p 90 lines 19 - 24.

**Discipline Imposed Upon Other Officers**

131. The Supervisors Mr. Davis contends ordered him to falsify reports (Donnelly and Sutherland) have each been convicted and sentenced to prison as a result of their actions. Mr. Donnelly was terminated by the Department on December 28, 1999. Mr. Sutherland resigned on February 27, 2003 (after having been on suspension since May 16, 2001). See Affidavit of Michael J. Harris at ¶ ¶ 3, 4, attached hereto as Exhibit 21.

132. Donnelly was sentenced to 46 months in prison, while Sutherland was sentenced to 10 months in prison. See portion of Docket Sheet for USA v. Donnelly et al, Case No. 00-10431-GAO, attached hereto as Exhibit 22.

133. Brian Bailey was convicted and sentenced to prison for his actions. He was terminated on April 22, 2003 (after having been on suspension since May 16, 2001). Exhibit 21 at ¶ 5.

134. Bailey was sentenced to 41 months in prison. Exhibit 22.

135. Michael Ross resigned on May 22, 2000. Exhibit 21 at ¶ 6.

136. Anthony Nuzzo was convicted and sentenced to 15 months in prison for his actions. He resigned on June 26, 2002 (after having been on suspension since May 16, 2001). Exhibit 21 at ¶ 7 and Exhibit 22.

137. Patrick Cook was placed on Administrative Leave without pay on October 21, 2002, was on active military duty as of January 19, 2003 and resigned on January 12, 2004. Exhibit 21 at ¶ 8.

138. Officer Bethune was acquitted at trial. He was suspended for 90 days without pay in September of 2003. Exhibit 22 and Exhibit 21 at ¶ 9.

139. Melvin Massucco was convicted and sentenced to 26 months in prison for his actions. He was terminated on March 12, 2003 (After having been on suspension since May 16, 2001). Exhibit 22 and Exhibit 21 at ¶ 10.

140. Steve Brown resigned on December 15, 2003. Exhibit 21 at ¶ 11.

**Cabral Appointment to Office of Sheriff**

141. Sheriff Cabral was sworn into office on November 29, 2002, having been appointed by Governor Jane Swift to serve the remainder of former Sheriff Richard Rouse's term, as Rouse had retired as of that date. Exhibit 11 at ¶ 2.

142. Rouse's retirement came amidst considerable negative publicity, and subsequent to a Report prepared by a commission that analyzed several aspects of the Sheriff's

Department's Operations – the so called "Stern Commission", as the commission was headed by former United States Attorney Donald Stern. Id. at ¶ 4.

143. Sheriff Cabral used many of the recommendations contained in the Stern Commission Report as a blueprint for change as she began her tenure as Sheriff. Id. at ¶ 5.

144. Sheriff Cabral was aware generally when she assumed office in November of 2002 that a number of jail officers had been indicted federally and were facing a trial for civil rights violations and obstruction of justice, and generally aware the some employees had been called to testify before the grand jury, she had no knowledge that Paul Davis had regularly covered-up instances of excessive force used by other officers against detainees, or that he had falsified written reports or lied to Department investigators about these incidents. Id. at ¶7 – 9.

145. Since assuming office in 2002, Sheriff Cabral has taken a number of steps to address to so-called "code of silence". Among these steps taken, the Sheriff reformed Department hiring and promotional processes and completely restructured the training and investigation divisions. Id at ¶ 23.

146. Sheriff Cabral has also very consistently imposed severe discipline where she determined that employees had engaged in misconduct. The Sheriff has terminated numerous corrections staff for a variety of reasons, which include introducing drugs or contraband into the facility; using excessive force; having inappropriate contact with inmates; failing to report / the submission of false reports; and violating the department's substance abuse policy. Id. at ¶¶ 27 – 28.

Respectfully submitted,
For the defendant
By its attorney

/s/ James M. Davin

James M. Davin
BBO# 566973
Deputy General Counsel
Suffolk County Sheriff's Department
200 Nashua Street
Boston, MA 02114
(617) 961-6679
Date: September 15, 2005