UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL DAVIS, ) | |
| ) | |
| Plaintiff ) | |
| ) | Civil Action No. 04-11851-WGY |
| v. ) | |
| ) | |
| SUFFOLK COUNTY, SUFFOLK ) | |
| COUNTY SHERIFF'S ) | |
| DEPARTMENT AND ANDREA ) | |
| CABRAL (in her official capacity), ) | |
| ) | |
| Defendants ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

The Plaintiff is a former jail officer who was terminated after *admitting to* numerous instances of submitting false reports concerning the use of excessive force against inmates; lying to supervisors concerning the use of excessive force against inmates; lying to Sheriff's Department investigators about the use of excessive force against inmates; and generally taking affirmative steps to cover up the excessive use of force against inmates that he personally witnessed at the hands of other jail officers. Each of the Plaintiff's *admitted* acts and omissions is a clear violation of department policy, and is completely at odds with the Department's two fold mission – and a jail officer's primary duty – to provide for the CARE and CUSTODY of inmates.

The Plaintiff brought suit against Sheriff Andrea Cabral (in her official capacity), Suffolk County Sheriff's Department, and Suffolk County. The Complaint contains four counts: Count I (alleged violation of M.G.L. c. 149 § 185) against Defendants Suffolk County and the Suffolk

County Sheriff's Department; Count II (alleged violation of 42 U.S.C. § 1983) against all defendants; Count III (alleged termination in violation of public policy) against Defendants Suffolk County and the Suffolk County Sheriff's Department; and Count IV (alleged violation of M.G.L. c. 12 §§ 11H and 11I) against all defendants.  On Defendants' Motion to Dismiss, the Court merged the wrongful termination and the state "whistleblower" claim into one count, dismissed Count VI in its entirely and also dismissed all claims against "the Suffolk County Sheriff's Department", as it is not a legal entity amenable to suit.  The motion was otherwise denied.

As will be discussed in more detail below, the plaintiff was terminated after admitting to having violated numerous department policies.  He regularly stood by and did nothing as other jail officers violated the civil rights of pre-trial detainees at the Nashua Street Jail and he actively participated in the cover-ups of these incidents.  Plaintiff never truthfully reported these matters internally, and did not report them to any external authorities until he was subpoenaed to testify before a federal grand jury.  In his initial meeting with the FBI and in his first appearance before the grand jury he was still untruthful, as he was admittedly still trying to cover up for another officer.  It was not until Mr. Davis received a proffer agreement from the government that he revealed more information.

The fact that Mr. Davis ultimately cooperated with federal authorities and testified at a criminal trial in this matter (<u>USA v. Donnelly et al</u>, Criminal Action No. 00-CR- 10431 RCL) cannot be found to be the reason for his termination, because one of his former colleagues, Brian Murphy, also cooperated with authorities and also testified in a similar fashion at the criminal trial.  Murphy was not terminated, but instead received a lengthy unpaid suspension for his admitted policy violations.

There is no dispute that Davis violated department policies and was subject to discipline for those violations. The dispute is instead over the level of discipline imposed, which Defendants maintain is not an appropriate area for judicial intervention. "A federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. <u>Mijos v. Swift</u>, 358 F.3d 91, 102 (1st Cir. 2004) (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 147, 103 S.Ct. 1684 (1983)). Where it was Davis' admitted violations of a plethora of department policies that led to his termination, and not the fact that he [ultimately] cooperated with federal authorities, summary judgment must be granted to defendants on all remaining counts.

## II.   FACTS

Defendants rely on the *Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1*, as well as documents that are filed therewith.

## III.   ARGUMENT

This Court has recently articulated the standard of review of a motion for summary judgment in a case factually similar to the instant matter. In <u>Putnam v. Town of Saugus</u>, 365 F.Supp.2d 151, 166 (D.Mass. 2005) it stated:

> *Summary judgment is warranted if, after reviewing the facts in the light most favorable to the non-moving party, no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law. … A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. … A fact is material when it "might affect the outcome of the suit under the governing law." …*
>
> *In making this determination, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. … The movant has the initial burden of production, which it can meet either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an "absence of evidence to support the non-moving party's case." … Once the movant has met its burden, the non-moving party must "go beyond the pleadings, and by [its] own affidavits, or by the depositions, answers to*

*interrogatories, and admissions on file, designate specific facts showing there is a material issue for trial." …* (Citations omitted).

"Brash conjecture, coupled with earnest hope that something concrete will eventually materialize, is insufficient to block summary judgment." Maldonado-Denis, 23 F.3d at 581, quoting Dow v. United Brotherhood of Carpenters, 1 F.3d 56, 58 (1st Cir. 1993).  Moreover, merely discrediting the moving party's testimony is not normally sufficient to defeat the mover's motion for summary judgment; instead, the non-mover must submit affirmative evidence.  First National Bank of Arizona v. Cities Service Co., 391 U.S. 253 (1968).

> **A.    The Plaintiff Is Unable To Demonstrate The Necessary Causal Link Between Any Protected Activity And An Adverse Employment Action.  Summary Judgment Must Therefore Be Granted To Defendants On Count II Of The Complaint – His First Amendment Claim.**

Paul Davis did not have a constitutional right to a job in which he stood idly by and watched colleagues physically abuse inmates at the Suffolk County Jail.  He did not have a constitutional right to falsify official reports or to lie to department investigators looking into the very incidents of abuse Davis so strenuously strove to shield from scrutiny.  Paul Davis has admitted to committing these egregious violations – of his own oath as a sworn law enforcement officer and of the policies of the Suffolk County Sheriff's Department with which he was required to comply.[1]  The fact that his admissions were aired during the course of a public trial does not in any way protect him from the consequences of his shameful actions.

In order to succeed on a claim of retaliation under the First Amendment, the plaintiff must be able to establish that:  (1) he spoke on a matter of public concern (Connick v. Myers,

---

[1] It should be noted that Davis testified at trial and at his disciplinary hearing that he would explain away injuries to detainees "from time to time" by falsely reporting that they had hit their head on a bed or a sink or a wall.  None of the false reports in the summary judgment record contain such bogus explanations for any inmate injuries, thereby bolstering defendants' position that Mr. Davis had submitted numerous *other* false reports not currently before this Court.

4

461 U. S. 138, 147-48, 103 S.Ct. 1684 (1983)); (2) the public's interest outweighs the government's interest in promoting efficient performance of the public service (Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731 (1968)); and (3) the protected activity was a substantial factor in an adverse employment decision (Mt. Healthy City School Dist. Bd. Educ. v. Doyle., 429 U.S. 274, 287, 97 S.Ct. 568 (1977).  See also Mijos v. Swift, 358 F.3d 91, 102-08 (1st Cir. 2004); Mullin v. Town of Fairhaven, 284 F.3d 31, 37 – 38 (1st Cir. 2002); Vazquez-Valentin v. Santiago-Diaz, 385 f.3d 23, 30 (1st Cir. 2004); Putnam v. Town of Saugus, 365 F.Supp.2d 151, 167 (D.Mass. 2005).

     Although one could certainly question plaintiff's motivation in coming forward years after the events in question, only after being subpoenaed to testify before a federal grand jury (and therefore doing only what he was required to do by law) and by only testifying (we assume) truthfully after receiving a proffer letter from the government,[2] Defendants concede that providing testimony in a criminal trial before this Court is a matter of public concern.  Putnam, 365 F.Supp.2d at 168 (speech is of particular public concern when it involves actual testimony in court)(citations omitted).  Given the nature of plaintiff's testimony relating to civil rights violations of detainees, such speech is afforded even more First Amendment protection.  Id. at 169.

     Concerning the second prong on this analysis, Defendants maintain that they did not attempt to curtail Mr. Davis' speech.  He was terminated for his admitted violation of numerous department policies throughout the course of his career, and not for testifying as a witness in the case of USA v. Donnelly et al.  For the purposes of this motion, therefore, Defendants do not

---

[2] Plaintiff admitted that he lied to the grand jury during his first appearance because he was still trying to cover up for a co-worker.

5

make an argument relative to the balancing of interests of the public in hearing the speech versus those of the Department in curtailing the speech in the interests of efficient operations.[3]

Defendants argue instead that plaintiff cannot satisfy the third prong of the test, namely that his protected activity was a substantial factor in an adverse employment action against him. Even if he could establish that his speech was a substantial factor, the record is replete with admission after admission of Davis' violations of numerous department policies regarding the use of excessive force against pre-trial detainees at the Nashua Street Jail. He knew he was going to be disciplined. The United States Attorney understood that Davis *had* to be disciplined. The only dispute in this case comes down to the appropriateness of the level of discipline Sheriff Cabral chose to impose against Davis for the shocking admitted abuses of his position over the entire course of his career. Under *Mt. Healthy*, Davis cannot avoid the consequences of his misconduct simply because he, for whatever reason, admitted to his misconduct in a public forum. Mt. Healthy, 429 U.S. at 285 – 86 (an employee who engaged in protected conduct ought not be able to prevent his employer from assessing his performance record and reaching an employment decision on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision).

1.  **Plaintiff Has Not Shown That His Protected Activity Was A Substantial Factor In The Sheriff's Decision To Terminate Him.**

Paul Davis and Brian Murphy each violated department policy by covering up the use of excessive force against a pre-trial detainee at the Nashua Street Jail.[4] Each man was subpoenaed to testify before the grand jury. Each man provided testimony about the misconduct of other jail

---

[3] Defendants submit that there is a very strong interest in enforcing the policies of the Suffolk County Sheriff's Department relative to timely reporting of misconduct and prohibitions against the use of excessive force. See, e.g. Watson v. Department of Justice, 64 F.3d 1524 (Fed.Cir. 1995); City of Boston v. Boston Police Patrolmen's Ass'n, 443 Mass. 813, 824 N.E. 2d. 855 (2005).

[4] With Murphy, it was one detainee on one occasion, while with Davis it was multiple detainees on multiple occasions.

6

officers in the case of USA v. Donnelly, admitting to his own misconduct and violation of department policies in the course of his testimony. Subsequent to the criminal trial, the Sheriff received a letter from the U.S. Attorney informing her of each man's cooperation in the criminal proceedings, and essentially asking for leniency in meting out discipline he understood *must* be taken against each. Each man was suspended and charged with violating numerous provisions of the department's policies concerning use of force and employee conduct, and internal disciplinary hearings were held for each. Subsequent to these disciplinary hearings, Paul Davis was terminated while Brian Murphy was not.[5] Where each individual testified before the grand jury and at trial, and where the U.S. Attorney sent a letter to the Sheriff on behalf of each of them, logic would dictate that the decision to terminate one and not the other must have been based on something other than the fact that he engaged in protected speech, because both of them did so. Something must have distinguished Davis from Murphy.

      The facts in this record are what distinguish Mr. Davis and Officer Murphy. As far as the record establishes, Murphy's wrongdoing, though egregious, related to a singular incident. Davis' misconduct, on the other hand, was serial. Although Murphy never should have opened Dais' cell nor falsified a report, he at least called for a SERT team when he saw officers assault the detainee. Davis stood feet away while detainees were being assaulted and did nothing. He did nothing to help detainee Milliken, detainee Roscoe or detainees Ackerly or Doocey. He also did his best to ensure that Bailey and Ross would not get into trouble for assaulting detainee Dais. Davis testified at his disciplinary hearing that he had covered up officer misconduct every single time he observed it throughout his twelve years at the department. He was completely unable to quantify how many false reports he had submitted over the course of his *career*,

---

[5] Murphy was suspended for six months without pay, put on probationary status for three years, and required to discuss the consequences of filing false reports at future department training classes.

7

reprehensibly stating that it could have been more than 100. Davis understood the written policies of the department, and acknowledged training in those policies. He understood the department's use of force policy. He understood that his actions were contrary to that policy and to the way he was trained, yet he chose to disregard the policy and his training, time and time again.

     Davis weakly attempts to hide behind the fact that his immediate supervisors were aware of his misconduct and that they encouraged it. *Plaintiff's Response to Request for Admissions* Nos. 16, 20, 21, 24-5, 30, 39, and 41, attached as Exhibit 1 to *Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1*. The fact that supervisors were engaged in the misconduct does not insulate Davis from his own acts and omissions. Department policy very clearly states that employees are accountable for their own actions, even if ordered to do something by a supervisor. Davis repeatedly demonstrated his understanding of this principle in the written examinations he took concerning the use of force policy. The fact that some supervisors were actually engaged in the misconduct underscores the need for this policy and for an officer's understanding that he or she is accountable for his or her own acts or omissions.

     What should not be lost in the quantum of Davis' policy violations, and his attempt to shield himself from accountability based on his supervisors' involvement, is the fact that neither of his former supervisors who was involved in this misconduct remains employed at the Jail. Not only did they lose their jobs, but they were sentenced to federal prison. Also sentenced to prison were Brian Bailey, Melvin Massucco and Anthony Nuzzo (with whom Davis would get together and write false reports). Others involved in various acts of misconduct resigned from the Department. Davis is lucky that he only lost his job and not his freedom.

Unlike the *Putnam* case, in which there was considerable evidence in the record that the employment decision was or could have been based on the employee's protected activity (statements that individual had "a problem" with the way the plaintiff handled the situation at issue, and didn't like the fact that the plaintiff had written a report on the matter, and evidence of areas of inquiry in promotional interview) *Putnam*. 365 F.Supp.2d at 174, there is no such evidence in the instant case.[6] There is no evidence in the record that Davis was terminated for any reasons other than those articulated in his Notice of Termination.

Courts have recognized that an employment decision involving an employee who has engaged in some form of protected activity, including activities under whistleblower protection statutes, will not subject the employer to a retaliation claim if it can establish that it would have taken the same action in the absence of the protected activity. See, e.g. Watson v. Department of Justice, 64 F.3d 1524 (Fed.Cir. 1995) (termination of border patrol agent upheld by the Court where the employee was terminated subsequent to his report about the unlawful actions of a co-worker, where the report against the co-worker revealed the employee's own violations of policy, which included his failure to timely report the misconduct he witnessed).

Although procedurally distinguishable, the *Watson* case is factually quite similar to the instant proceeding, as are the legal issues involved. Watson was a border patrol agent in Arizona. On the evening of June 12, 1992, he and another agent had encountered some "scouts" while on patrol. Watson fired a warning shot into the air (a violation of agency policy) as well as a number of shots over the head of the scout. The other agent in the area informed Watson that he [the other agent] had shot and killed a scout, who was not armed. Pointing his weapon at Watson on two separate occasions, the other agent made it clear that he did not want Watson to

---

[6] The plaintiff has not taken any depositions in this matter, let alone depositions of anyone involved in the decision to terminate Mr. Davis.

9

report the incident. Watson did not report the incident before his shift ended that night (as policy required him to) but did report it (including his own misconduct) at 10:30 a.m. the next day. The other agent was subsequently charged criminally, and Watson testified at the trial. Watson was terminated for his untimely disclosure of the actions of the other agent and for his own admitted misconduct. Watson claimed that his termination was a violation of the Federal Whistleblower Protection Act. See Watson, 64 F.3d at 1526 – 1527.

The *Watson* Court affirmed his termination. It specifically held that there is no "inevitable discovery" rule in the statute or in the *Mt. Healthy* case. An employee can be terminated for protected disclosures, the content of which reveal the disclosing party's own misconduct, which form the basis of the termination. Essentially, the Court found that the agency did not have to prove that it would have discovered the facts on which it based its personnel action from a source other than the protected disclosure of the employee. Id. at 1528. Responding to Watson's argument that his termination punished him for making disclosures rather than encouraging him to do so, the Court stated:

> **Watson is correct that law enforcement officers, who have an overriding duty to report violations of law in a timely fashion, are in a unique position when faced with the decision whether to blow the whistle on wrongdoing. On the one hand, the WPA was clearly intended to encourage such disclosures and to prevent reprisals against the whistleblowing employee.** *See* Whistleblower Protection Act of 1989, Pub.L. No. 101-12, § 2, 103 Stat. 16 (1989) (5 U.S.C.A. § 1201 note (West Supp.1995)) (Congress enacted the WPA to "strengthen and improve protections for the rights of Federal employees, to prevent reprisals, and to help eliminate wrongdoing within the government…."). **On the other hand, a federal law enforcement officer who does not make a disclosure in a timely fashion risks punishment for untimely disclosure if he does disclose the illegality.** Nevertheless, we do not accept Watson's argument that untimely disclosure should never be used as a basis for disciplinary proceedings. That approach would be for Congress. **Moreover, law enforcement agencies have an obvious interest in ensuring that incidents such as this will be timely reported. Thus, although we agree with Watson that the law enforcement officer faced with a choice between untimely disclosure or no disclosure is in an uncomfortable position, at the same time, the duty to disclose wrongdoing**

10

>**within certain time limits makes it in the officer's interest to report violations of law.** The fact that a protected disclosure may be made as part of an employee's duties, but that an employee may nevertheless be disciplined for violating agency policy if his disclosure is untimely, strikes a balance between the intent of the WPA and the agency's interest in prompt disclosure of wrongdoing. *See Marano, 2 F.3d at 1142; see also* 140 Cong.Rec. H11419, H11421 (daily ed. Oct. 7, 1994) ("*A protected disclosure may be made as part of an employee's job duties····*"). Watson argues that the board's approach discourages federal law enforcement agents from disclosing wrongdoing. To the contrary, the approach balances the expansive protections of the WPA with the agency's legitimate interests as set forth in its regulations, and should encourage agents to disclose wrongdoing in a *timely* manner. Moreover, Watson's assumption that there would have been no adverse consequences to him if he had not disclosed Elmer's wrongdoing is contradicted by deciding official Ronald J. Dowdy's testimony that he would have considered criminal charges against Watson had he discovered that Watson had not disclosed these events. **Law enforcement officers are held to a higher standard of conduct than are other federal employees; the board in this case merely recognizes that fact.** Id. at 1530 (emphasis added).

The plaintiff in Watson was much more of a "whistleblower", as that term is commonly understood, than Mr. Davis. Watson, despite being threatened at gunpoint on two occasions, voluntarily reported the serious misconduct of a co-worker (who had shot and killed an unarmed man), as well as his own misconduct, only fifteen hours after it occurred. Because this disclosure was untimely under agency policy, he was terminated by the Justice Department. By contrast, Mr. Davis waited years, not hours, to reveal the misconduct he witnessed and in which he partook.[7] Unlike Watson, Mr. Davis was never threatened with harm. Unlike Watson, Mr. Davis did not come forward voluntarily – he was subpoenaed to testify before a federal grand jury.

Paul Davis was not a whistleblower. He was and is a man who responded to a grand jury subpoena and still did not fully cooperate until after he had received a proffer letter that would protect him from prosecution based on the truthful testimony that he gave. He admittedly lied to

---

[7] Mr. Davis never "reported" this misconduct to the Suffolk County Sheriff's Department. Whatever he may have told the grand jury, and the testimony he ultimately gave in the *Donnelly* case was never previously disclosed by him to the Department. His response to the grand jury subpoena and his responses to grand jury questions were compelled by law.

11

federal authorities and to the grand jury because he was still trying to cover up for another officer. Admitting to his misconduct publicly does not provide him amnesty for his years of lies and cover-ups. He deserved to be fired for such a blatant abuse of power and consistent disregard for the written rules and regulations of the Sheriff's Department. Mr. Davis was a sworn law enforcement officer, who serially ignored his oath. The *Watson* Court found that a law enforcement officer should be held to a higher standard. Defendants ask this Court to make a similar finding.

The record is filled with evidence supporting the fact that Mr. Davis was terminated for violating Department policies, and not in retaliation for any protected activity. Of particular significance, as discussed above, is the fact that the employee most similarly situated to him – Brian Murphy – was not terminated. They both engaged in the same protected activity and one was fired while the other was not. This fact alone should be enough to break any inference of causation between Mr. Davis' protected activity and the level of discipline he received. He was not terminated because he testified or cooperated. He was terminated because he was an employee who disgraced his badge on countless occasions and who could no longer be trusted, an employee whose actions only became known to his employer through his public statements. *Mt. Healthy* holds that those public statements cannot protect him from legitimate disciplinary action.

    **2.**        **Davis Is Unable To Show That Suffolk County Is The Moving Force Behind A Constitutional Deprivation.**

To prevail on a claim against a municipality under 42 U.S.C. § 1983, Plaintiff must show he was deprived of his constitutional rights through the application of an unambiguous official custom or policy. Manarite v. City of Springfield, 957 F2d 953 (1st Cir. 1992), *cert. denied*, 113 S.Ct.113 (1992). He must show that Suffolk County was a "moving force" behind the

deprivation of the Plaintiff's constitutional rights. Kentucky v. Graham, 473 U.S. 159, 173 (1985). It is not enough to allege that the employees of the entity were the cause of the injury. The United States Supreme Court has established that municipalities cannot be held vicariously liable under 42 U.S.C. § 1983 for their employees' actions unless such actions were pursuant to official municipal policy and caused a constitutional tort. Monell, 436 U.S. 658 (1978), City of Oklahoma City v. Tuttle, 471 U.S. 808 (1985), Jett v. Dallas Independent School District, 491 U.S. 701 (1989), City of Canton v. Harris, 489 U.S. 378 (1989).

To determine whether a custom or policy is in place for purposes of finding municipal liability, two requirements must be met: "First, the custom or practice must be attributable to the municipality. In other words, it must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice. Second, the custom must have been the cause of and the moving force behind the deprivation of constitutional rights." Bordanaro v. McLeod, 871 F2d 1151, 1156 (1st. Cir. 1989) (Internal citations omitted).

Sheriff Cabral was appointed to serve the remainder of her predecessor's term on November 29, 2002, on the eve of a criminal trial against several former jail officers and supervisors, and in the wake of numerous allegations of mismanagement of that prior administration. Just three months after the Sheriff had been in office, the plaintiff testified as a witness in the above trial. He testified not only about the misconduct of others that he witnessed at the jail, but more importantly for the purposes of the instant case, about his own wrongdoing. He admitted to violations of Sheriff's Department policy that he had previously denied.[8] He

---

[8] There is no dispute that the official policy of the Sheriff's Department prevented the use of excessive force against detainees and that it prevented an officer from allowing another officer to use excessive force. Similarly, there is no dispute that the failure to report the excessive use of force and the submission of a false report are violations of official Department policy.

admitted to falsifying reports and lying to investigators. Immediately after these egregious violations were brought to the Department's attention, Davis was placed on administrative leave. A disciplinary hearing was subsequently held and he was terminated for his admitted wrongdoing.

Municipal liability does not attach unless a policy making official is aware of a widespread and settled policy or practice that causes a constitutional harm and does nothing to end the practice. Just three months after assuming office Sheriff Cabral was confronted with *admissions* of a jail officer that he had falsified numerous reports and lied to investigators about instances of excessive force that he had witnessed. She did not sit idly by as Davis chose to do – she took action. She acted by terminating Davis, thereby sending a message to all staff that such misconduct and inaction by an employee will not be tolerated under her Administration. To the extent that there was any "practice" concerning a code of silence, the termination of Davis cannot be said to perpetuate it any way. It was a positive first step in telling her staff and the public at large that officers cannot engage in such misconduct and expect to retain their jobs. Count II must be dismissed.

The Sheriff's decision to terminate Mr. Davis is contrasted with her decision to suspend Brian Murphy. Her innovative approach to dealing with Murphy penalized him for his misconduct, ensured he would be terminated for similar infractions in the future, and also allowed other officers to hear first-hand of the consequences of falsifying reports when Murphy addressed them in training classes, hopefully serving as a serious deterrent for them.

Defendants' deny the existence of any unconstitutional custom, practice or policy. They also state that to the extent plaintiff could establish the existence of such a policy, there is no causal link to his termination. Plaintiff knowingly disregarded his training and knowledge of

14

department policies when he decided to willingly cover-up the assaults of detainees in the Nashua Street Jail by repeatedly lying and submitting false reports.  This is the reason for his termination.  To the extent that there existed a code of silence at the jail, Davis' termination, which occurred very early on in Sheriff Cabral's tenure, was a positive first step towards its elimination.[9]

> **B.  The Plaintiff Cannot Prove That He Was Terminated *Because* He Engaged In Protected Activity.  Count I Of The Complaint, Brought Pursuant To The Massachusetts Whistleblower Statute, Must Fail.**

The Massachusetts Whistleblower statute, M.G.L. c. 149 § 185, states:

(b) An employer shall not take any retaliatory action against an employee **because** the employee does any of the following:

(1) Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or of another employer with whom the employee's employer has a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment;

(2) Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law, or activity, policy or practice which the employee reasonably believes poses a risk to public health, safety or the environment by the employer, or by another employer with whom the employee's employer has a business relationship; …
…
(f) Nothing in this section shall be deemed to diminish the rights, privileges or remedies of any employee under any other federal or state law or regulation, or under any collective bargaining agreement or employment contract; except that the institution of a private action in accordance with subsection (d) shall be deemed a waiver by the plaintiff of the rights and remedies available to him, for the actions of the employer, under any other contract, collective bargaining agreement, state law, rule or regulation, or under the common law.
…

---

[9] Sheriff Cabral has taken many other steps to ensure that officers are accountable for their own actions.  These measures, articulated in her affidavit, begin at the application process, continue through training, and are evident in departmental investigations and the imposition of discipline.

15

The instant case, as discussed above, is a dispute about the level of discipline actually imposed upon an employee who admitted to violating numerous department policies. Defendants suggest that this is not the proper forum to determine the appropriate disciplinary sanction when an employee has admitted to violating numerous policies of the employer.[10] His claim under the Massachusetts Whistleblower statute must fail for the same reasons as his First Amendment Claim – there is no causation.

In any event, the plaintiff did not come forward with information, but rather did all he could to prevent it from being detected until he was ultimately confronted and questioned by the FBI. Such self-preservation in the midst of a federal criminal investigation does not transform the plaintiff from a participant and abettor in the unlawful activity to a benevolent whistleblower deserving of protection from the necessary consequences of his own misconduct. There is absolutely nothing in the summary judgment record to suggest that the plaintiff was treated differently than any other employee who did not testify at trial but who *admittedly* engaged in the submission of numerous false reports about inmate abuse and who had admittedly lied to investigators looking into an incident of excessive force the employee had witnessed.

Paul Davis is not a whistleblower nor is he an individual for whom the statute was enacted to afford certain protections and incentives to come forward to report illegal or illicit activities. Davis was an active participant in lying and covering up numerous instances of inmate abuse at the Suffolk County Jail. He only "came forward", and that term is used very loosely, when confronted by federal agents during the course of an investigation into the very

---

[10] If the plaintiff believed that there was not "just cause" to discipline him, he should have resorted to whatever administrative remedies were available to challenge that decision. See, e.g. Chapter 135 of the Acts of 1960, a copy of which was provided to the plaintiff upon his termination. This statute states:
   Section 1. Any person employed in the Suffolk County Jail in the office or position of … jail officer … whose office or position is not classified under Chapter thirty-one of the General Laws, and who has held such office or position for not less than seven years, shall not be involuntarily separated from such office or position except subject to and in accordance with the provisions of sections forty-three and forty-five of said chapter thirty-one to the same extent as if the said office or position were classified under said chapter. …

incidents Davis tried to cover up. He "came forward" not to bring any misconduct to light, but likely to protect himself from criminal prosecution. As such, Count I of the Complaint must be dismissed.

Defendants state that the plaintiff must prove that he was terminated **because** he engaged in protected activity. For all the reasons discussed above, including the multitude of admitted abuses and violations of policy to which Davis has admitted, as well as the fact that the other officer who engaged in the same protected activity – Brian Murphy – was not terminated, defendants maintain that the plaintiff cannot establish the causation necessary to prevail on his claim.

Public Policy.

Davis' termination was not a violation of public policy, as claimed by the plaintiff.[11] It is hard to imagine a public policy that would frown upon the termination of a sworn law enforcement officer for the submission of numerous false reports, for the obstruction of investigations into inmate abuse by prison staff, for failing to report known violations of department policy and for essentially covering-up staff misconduct, especially as it related to abuse of inmates, for the duration of his twelve year career.

The Massachusetts Supreme Judicial Court has recently decided a case involving misconduct by a police officer as it related to public policy. The Court, based on public policy considerations, overturned an arbitrator's decision to reinstate a police officer that had violated department policy by abusing his position, filing false reports and providing false testimony under oath. The abuse of the officer's official position and rationale for his necessary

---

[11] Defendants restate the argument presented in the Motion to Dismiss that any common law cause of action of termination in violation of public policy is necessarily waived based on the language in the statute. In ruling on the Motion to Dismiss, the Court merged the public policy count into the Whistleblower count.

17

termination is particularly significant for the instant case, with respect to plaintiff's public policy argument.  See City of Boston v. Boston Police Patrolmen's Ass'n, 443 Mass. 813, 824 N.E. 2d. 855 (2005).[12]

In that case, the Court made several findings, some of which are summarized below, which directly contradict plaintiff's position that his termination was contrary to public policy:

> Given the arbitrator's findings that DiSciullo had falsely arrested two individuals on misdemeanor and felony charges, lied in sworn testimony and over a period of two years about his official conduct, and knowingly and intentionally squandered the resources of the criminal justice system on false pretexts, an agreement to reinstate DiSciullo would offend public policy. "One of the most important police functions is to create and maintain a feeling of security in communities. To that end, it is extremely important for the police to gain and preserve public trust, maintain public confidence, and avoid an abuse of power by law enforcement officials." Clancy v. McCabe, 441 Mass. 311, 328, 805 N.E.2d 484 (2004) (Ireland, J., dissenting). "The image presented by police personnel to the general public ... 'also permeates other aspects of the criminal justice system and impacts its overall success.' " Civil Serv. Comm'n v. Johnson, 653 N.W.2d 533, 538 (Iowa 2002), quoting Fort Dodge v. Civil Serv. Comm'n, 562 N.W.2d 438, 440 (Iowa Ct.App.1997).  Id at 819 – 820.
>
> …
> A police officer who uses his position of authority to make false arrests and to file false charges, and then shrouds his own misconduct in an extended web of lies and perjured testimony, corrodes the public's confidence in its police force. … That DiSciullo has not been convicted of any felony and that the arbitrator did not credit the assault and battery charges against him are [] beside the point. … **It is the felonious misconduct, not a conviction of it, that is determinative.**  Id at 820 – 821 (emphasis added).
>
> We fail to see how exoneration of some felonious conduct cleanses or mitigates other felonious conduct. DiSciullo committed his serious breaches of the law while on the job and presuming to carry out his duties. The Legislature has forbidden persons found to have engaged in such conduct from becoming police officers and, by implication, from remaining police officers. Here, DiSciullo's misconduct could not have been committed but for the authority vested in him as

---

[12] As a result of this decision, the SJC has remanded the case of Sheriff of Suffolk County v. AFSCME Council 93, AFL-CIO, Local 1134, 62 Mass.App.Ct. 915 (2004) back to the Appeals Court for reconsideration in light of that decision.  See Sheriff of Suffolk County v. AFSCME Council 93, AFL-CIO, Local 1134, FAR-14517.  The Suffolk County case involves a Suffolk County jail officer who was terminated for his failure to report the use of excessive force by jail officers against a detainee at the jail.  He was reinstated by an arbitrator, who reduced his suspension to six months without pay.  Suffolk County appealed on public policy grounds, and the case remains pending.

> a police officer. **His actions thus go "to the heart of [his] responsibilities."** Id at 820 –821, (emphasis added and citations omitted).
>
> **Leniency toward egregious police misconduct in the past (assuming such leniency occurred) cannot lead a police officer to commit reprehensible actions in the expectation that he will receive a light punishment.** Id at p. 822, footnote 9 (emphasis added).
>
> The public policy against requiring the reinstatement of police officers who have committed felonious misconduct stems from the necessity that the criminal justice system appear legitimate to the people it serves. People will not trust the police-- on the street or in court--unless they are confident that police officers are genuine in their determination to uphold the law. As the city reminds us, police legitimacy would be damaged severely by reports that the city continued to employ a police officer who had illegally abused his power and repeatedly lied about it under oath. Indeed, DiSciullo's involvement in an investigation could prejudice the public against an otherwise flawless criminal prosecution. Id at 823.

Officer DiSciullo's misconduct resulted in the false arrest of two civilians, and the filing of criminal charges against them, which were eventually dropped. While they claimed to have been assaulted, the arbitrator did not make such a finding. In Mr. Davis' case, by contrast, the misconduct resulted in the deprivation of constitutional rights of countless detainees, including their right to be free from unwarranted assaults at the hands of jail officers.

The lengthy analysis the Court undertook to determine the public policy implications of forcing the city to take DiSciullo back as a police officer apply equally to the instant case.[13] Mr. Davis' misconduct certainly went to the heart of his job duties as a corrections officer, and he regularly abused his position by failing to protect inmates, by lying to investigators, by submitting false reports and by taking other actions to cover-up the violation of detainees' rights at the Suffolk County Jail. Accepting for the sake of argument Davis' position that others had in the past engaged in similar misconduct with impunity, termination is still warranted. "Leniency toward egregious police misconduct in the past (assuming such leniency occurred) cannot lead a

---

[13] We are not faced in the instant case with a situation in which the Court is bound to give great deference to an arbitrator's opinion. There is no arbitration award, as Mr. Davis did not pursue any administrative remedies.

police officer to commit reprehensible actions in the expectation that he will receive a light punishment." City of Boston, 443 Mass. at 822, footnote 9.  Mr. Davis' claim under the Massachusetts Whistleblower Statute, including his claim that his termination was in violation of public policy, must be dismissed, and he should not be reinstated to the position that he abused for so long.

### IV.    CONCLUSION

For all the foregoing reasons, the Defendants Sheriff Andrea Cabral, Suffolk County and the Suffolk County Sheriff's Department respectfully request that this Honorable Court grant their Motion For Summary Judgment.

### Local Rule 7.1 Certification

I hereby certify that I conferred with Attorney Christie Charles on September 12, 2005 in an attempt to narrow the issues raised by Defendants' Motion for Summary Judgment.

/s/ James M. Davin_____

Respectfully submitted for all
DEFENDANTS,
By their attorney


/s/_James M. Davin_____
James M. Davin, BBO # 566973
Deputy General Counsel
Suffolk County Sheriff's Dept.
200 Nashua Street
Boston, MA 02114
(617) 961-6679

20