1
2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

3

————————————————————————————

**EXHIBIT**

4

UNITED STATES OF AMERICA,

2

5

                    Plaintiff,

6

V.

**COPY**

7

WILLIAM R. BENSON

8

BRIAN BAILEY, and

9

THOMAS M. BETHUNE, JR.,

10

                    Defendants.

11

————————————————————————————

12

13

Criminal Action No. 00-CR-10431-RCL
March 17, 2003,

14

Boston, Massachusetts

15

TRANSCRIPT OF TESTIMONY OF BRIAN MURPHY

16

BEFORE THE HONORABLE REGINALD C. LINDSAY

17

UNITED STATES DISTRICT COURT

18

11TH DAY OF TRIAL

19
20
21
22

DEBRA M. JOYCE, RPR, CRR
Official Court Reporter

23

John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204

24

Boston, MA  02210
617-737-4410

25

```
 1    APPEARANCES:

 2    FOR THE GOVERNMENT:        S. THEODORE MERRITT, ESQ.
                                 THEODORE D. CHUANG, ESQ.
 3                               Assistant United States Attorney
                                 Office of the United States Attorney
 4                               John J. Moakley U.S. Courthouse
                                 1 Courthouse Way, Suite 9200
 5                               Boston, MA  02210
                                 617-748-3100
 6
 7                               LISA M. KRIGSTEN, ESQ.
                                 U.S. Department of Justice
                                 Civil Rights Division
 8                               P.O. Box 66018
                                 Washington, DC  20035-6018
 9                               202-305-9188

10    FOR THE DEFENDANT          DOUGLAS I. LOUISON, ESQ.
      WILLIAM R. BENSON:         Merrick, Louison & Costello
11                               67 Batterymarch Street
                                 Boston, MA  02110
12                               617-439-0305

13    FOR THE DEFENDANT          EVAN SLAVITT, ESQ.
      BRIAN BAILEY:              Bodoff & Slavitt LLP
14                               77 North Washington Street
                                 Boston, MA  02114-1908
15                               617-742-7300

16    FOR THE DEFENDANT          STEPHEN C. PFAFF, ESQ.
      THOMAS M. BETHUNE, JR.:    Merrick, Louison & Costello
17                               67 Batterymarch Street
                                 Boston, MA  02110
18                               617-439-0305

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1    (The following proceedings were held in open court

2 before the Honorable Reginald C. Lindsay, United States

3 District Judge, United States District Court, District of

4 Massachusetts, at the John J. Moakley United States Courthouse,

5 1 Courthouse, Way, Boston, Massachusetts, on March 17, 2003.

6    The defendants, William Benson, Brian Bailey, and

7 Thomas Bethune, are present with counsel.  The Assistant United

8 States Attorneys and the Department of Justice attorney are

9 present.)

10    BRIAN MURPHY, having been duly sworn by the Clerk,

11 was examined and testified as follows:

12                  DIRECT EXAMINATION

13 BY MR. MERRITT:

14 Q.  Sir, would you please speak into the microphone and state

15 your full name.

16 A.  Brian Murphy.

17 Q.  How old are you, Mr. Murphy?

18 A.  Thirty-nine.

19 Q.  And where did you grow up?

20 A.  Dorchester.

21 Q.  What town do you live in now?

22 A.  Braintree.

23 Q.  And are you married?

24 A.  Yes.

1    Q.  Do you have a family?

2    A.  Wife and two kids.

3    Q.  And are you currently employed?

4    A.  Yes.

5    Q.  Where?

6    A.  At the Sheriff's Department.

7    Q.  Suffolk County?

8    A.  Yes.

9    Q.  When were you first hired by the Sheriff's Department?

10   A.  June of '92.

11   Q.  And in what position were you hired?

12   A.  Jail officer.

13   Q.  And what's your current position?

14   A.  Jail officer.

15   Q.  How do you describe your duties as a jail officer?

16   A.  Care, custody, control.

17   Q.  Of whom?

18   A.  Of inmates.

19   Q.  Have you had different assignments over your career at the

20   jail?

21   A.  Yes.

22   Q.  What are some of those assignments?

23   A.  Units, booking room, control booths.

24   Q.  Where are you working now?

25   A.  Booking room.

1   Q.  And what do you do in the booking room?

2   A.  Just process, put in the bails, type their information, put

3   the bails, court dates.

4   Q.  Have you ever been on a SERT team?

5   A.  Never.

6   Q.  Are you familiar with the policies and procedures of the

7   Sheriff's Department with respect to the use of force?

8   A.  Yes.

9   Q.  And did you know or understand that you were required to

10  write certain reports when force was used?

11  A.  Yes.

12  Q.  Do you know what a disciplinary report is?

13  A.  Yes.

14  Q.  What is that?

15  A.  If an inmate breaks a rule, infractions of the rules, you

16  write a disciplinary report.

17  Q.  And how about an incident report, do you know what that is?

18  A.  Yes.  If there's a certain incident you write what

19  happened.

20  Q.  Are you familiar with the Sheriff's Investigative Division,

21  SID?

22  A.  Correct.

23  Q.  What is your understanding of what SID's role is in regards

24  to incidents where force was used?

25  A.  They investigate it.

1   Q.  And in the course of that investigation do you have an

2   understanding about what reports are reviewed?

3           MR. SLAVITT:  Objection.

4           THE COURT:  Overruled.

5   BY MR. MERRITT:

6   Q.  Did you have an understanding what reports SID reviewed

7   when they investigated use of force incidents?

8   A.  Incident reports, use of force reports.

9   Q.  And did you have an understanding what the possible results

10  of an SID investigation could be when there was a use of force?

11          MR. LOUISON:  Objection.

12          MR. PFAFF:  Objection.

13          THE COURT:  Overruled.

14  A.  Yes.

15  Q.  What was your understanding?

16  A.  They could prosecute you at the state level or the federal

17  level.

18  Q.  Prosecute whom?

19  A.  An officer.

20  Q.  Now, let me direct your attention to late September of

21  1999.  Do you recall what shift you were working around that

22  time?

23  A.  3:00 to 11:00.

24  Q.  Did you work on the 3:00 to 11:00 for a period of time in

25  1999?

1  A.  Yes.

2  Q.  How long?

3  A.  I've been on the shift for about ten years now.

4  Q.  And in September of 1999 did you have a particular

5  assignment in the jail?

6  A.  That day or --

7  Q.  Well, in late September.

8  A.  No.  Probably floating.

9  Q.  You were flowing?

10  A.  Floating.

11  Q.  Let me ask you specifically about September 24, 1999.  Now,

12  you've reviewed some records before you testified?

13  A.  Yes.

14  Q.  Do you know where you were assigned that day?

15  A.  The medical control booth.

16          MR. MERRITT:  May I approach the witness, your

17  Honor?

18          THE COURT:  Yes.

19  BY MR. MERRITT:

20  Q.  Let me show you what's been marked as Government Exhibit

21  80.  Do you recognize what that is?

22  A.  Yes.

23  Q.  What is that?

24  A.  That's a page from the logbook.

25  Q.  And for Friday, September 24, 1999?

1    A.  Yes.

2              MR. MERRITT:  Your Honor, I'd move in Government

3    Exhibit 80.

4              THE COURT:  Any objection?

5              MR. LOUISON:  No, your Honor.

6              MR. SLAVITT:  No, your Honor.

7              THE COURT:  Exhibit 80 is admitted.

8              (Exhibit 80 received into evidence.)

9    BY MR. MERRITT:

10   Q.  And just drawing your attention to Exhibit 80 and what's on

11   the screen, is that a copy of what's in front of you?

12   A.  Correct.

13   Q.  Now, you work the 3:00 to 11:00 shift?

14   A.  Correct.

15   Q.  And this is a logbook for which unit?

16   A.  The medical -- the medical.

17   Q.  The medical?

18   A.  Yeah.

19   Q.  And what was your assignment?

20   A.  The medical control booth.

21   Q.  Now, you see this indication here.  Is that what you're

22   referring to?

23   A.  Yes.

24   Q.  Now, someone else's name is crossed out.

25   A.  Correct.

1    Q.   And your name is written in.

2    A.   Correct.

3    Q.   Whose writing is all this?

4    A.   I believe that's mine.

5    Q.   And did you -- was, in fact, your assignment then the

6    medical control booth on that day?

7    A.   Yes.

8    Q.   And who was assigned to the psych side control booth?

9    A.   Officer Ross.

10   Q.   And who was assigned to the unit?

11   A.   Officer Bailey.

12   Q.   And the rest of the entries down here, Mr. Murphy, did you

13   make those entries?

14   A.   Yeah, that's my handwriting.

15   Q.   Now, you mentioned that there was a Michael Ross working on

16   the psych side.  Did you know him?

17   A.   Just to say hi to him.  Not even -- about that, just about

18   it.

19   Q.   So had you worked in the medical unit much before September

20   24, 1999?

21   A.   Just back in '95 I worked there for like four months,

22   because I ruptured my Achilles tendon.

23   Q.   So this was not a regular assignment for you?

24   A.   No.

25   Q.   How about Brian Bailey.  Did you know him?

1  A.  Just to say hi to.

2  Q.  Do you see him in the courtroom today?

3  A.  Yes.

4  Q.  Can you just point him out by article of clothing?

5  A.  He's right there.

6          (Brian Bailey stood up.)

7  BY MR. MERRITT:

8  Q.  Now, when were you in the medical booth on September 24,

9  1999 could you hear anything that was going on on the psych

10  side?

11  A.  No.

12  Q.  Could you see anything going on on the psych side?

13  A.  No.

14  Q.  As part of your job at some point did you go relieve

15  Officer Ross in the psych control booth?

16  A.  Correct.

17  Q.  And why were you relieving him?

18  A.  For lunch.

19  Q.  And about what time was that?

20  A.  Approximately around 6:30.

21  Q.  I'm going to ask you to keep your voice up if you could.

22  A.  Okay.  6:30.

23          THE COURT:  Move the microphone a little closer to

24  you.

25          THE WITNESS:  Sorry.

1   Q.  Do you know what a Q-5 is?

2   A.  Suicide precaution.

3   Q.  And in your experience is that where -- is the psych side

4   where Q-5s are held?

5   A.  Correct.

6   Q.  When you walked to the psych wing around 6:30 did you

7   become aware of any particular inmate in the psych wing?

8   A.  Yes.

9   Q.  And in what cell was he?

10  A.  5564.

11  Q.  And where is 5564 located?

12  A.  Directly in front of the control booth.

13  Q.  And did you later learn this inmate's name?

14  A.  Nikolas Dais.

15  Q.  And when you walked by cell 5564 did you hear anything

16  coming from that cell?

17  A.  Yeah.  He was banging the door and saying about you punched

18  me in the head or something.

19  Q.  Where did you go after walking by 5564?

20  A.  Into the control booth.

21  Q.  And who was present?

22  A.  Officer Ross.

23  Q.  And anyone else present there?

24  A.  Officer Bailey, but I think he was out in the common area.

25  Q.  Were they -- how close were they standing to each other?

1    A.  Not too far apart, I believe.

2    Q.  Approximately?

3    A.  A couple of feet maybe.  I don't know.

4    Q.  Did one of them say something to you?

5    A.  Yes.

6    Q.  Can you recall which one it was who said the statement?

7    A.  I'm not sure.  I'm not sure who said it.

8    Q.  What was said then to you?

9    ✓A.  That they were going in the room.

10   Q.  When it was referred to the room did you know what they

11   were referring to?

12   ✓A.  Inmate 5564.

13   Q.  Now, is there a procedure for an officer to follow if

14   you're going into the cell of an inmate for a legitimate

15   reason?

16   ✓A.  You call a floor supervisor.

17   Q.  Did they ask you to call a floor supervisor?

18   A.  No.

19   Q.  At the point that they said that was Mr. Dais doing

20   anything that you recall?

21   A.  No.

22   Q.  Did you see any medical emergency at that time?

23   A.  No.

24   Q.  Did you say anything back to them when it was said that

25   they were going into the cell?

1    A.  Yes.

2    Q.  What did you say?

3    A.  I said I wanted no part of it, you better write good

4    reports, and if anything happens I'm going to call the SERT

5    team.

6    Q.  What did you mean when you said I don't want no part of it?

7                MR. SLAVITT:  Objection.

8                THE COURT:  Sustained.

9    BY MR. MERRITT:

10   Q.  What did you mean when you said you better write good

11   reports?

12               MR. SLAVITT:  Objection.

13               THE COURT:  Sustained.

14               MR. MERRITT:  Well, may we be heard on this, your

15   Honor?

16               THE COURT:  Yes.

17               (At side bar on the record.)

18               THE COURT:  Yes?

19               MR. MERRITT:  Your Honor, Mr. Murphy is an

20   unindicted co-conspirator, and he's going to testify later that

21   he, in fact, wrote reports after Bailey told him what to write,

22   how to write it, and they wrote false reports to cover up the

23   incident.  So the fact that his mind -- state of mind is

24   relevant because he participates with them in covering up the

25   incident.

1    THE COURT: What do you say about that?

2    MR. SLAVITT: Your Honor, even if his statements --

3    well, statements coming in as verbal acts in any event, but

4    whether he's a co-conspirator or not, unless he said something

5    to Bailey, his state of mind or what he meant by the words is

6    not relevant. Only the fact that he said them is what

7    Mr. Bailey understood or did, not what Mr. Murphy understood or

8    did.

9        I'd also suggest, by the way, that now the

10    government is going to have to undertake the role to the

11    Court's satisfaction that Mr. Murphy is yet another unindicted

12    co-conspirator. In any event, his state of mind is not at

13    issue, is not relevant to what Mr. Bailey understood or didn't

14    understand. That is not relevant.

15    THE COURT: What do you say about that?

16    MR. MERRITT: Your Honor, the state of mind of

17    other co-conspirators covering up this incident is directly

18    relevant. Of course he can be cross-examined about

19    Mr. Bailey -- you don't know what Mr. Bailey thought or

20    whatever -- but the evidence for the jury to infer that is

21    exactly what Mr. Bailey knew, exactly what he meant by that,

22    because, in fact, he did write reports, good reports,

23    suggesting co-conspirator knows how to cover up that they went

24    in there.

25    THE COURT: Objection is sustained.

1            (End of discussion at side bar.)

2    BY MR. MERRITT:

3    Q.  Mr. Murphy, after you told them that they better write good

4    reports what's the next thing that happened?

5    A.  They went over -- they went by the 5564.

6    Q.  And were you in the control booth at this point?

7    A.  Correct, yes.

8    Q.  What happened next?

9    A.  They asked me to open the door.

10   Q.  And did you open the door?

11   A.  Correct.

12   Q.  How do you open the door from the control booth?

13   A.  I press a button.

14   Q.  When you opened the cell door did you see Inmate Dais?

15   A.  Yes.

16   Q.  In what position was he in?

17   A.  He was standing up.

18   Q.  He wasn't on the floor?

19   A.  I didn't see that.

20   Q.  And after you opened the door what did you see happen next?

21   A.  They were talking for a couple of minutes and then they

22   grabbed him, they fell to the bed.

23   Q.  When you say they, could you be more specific?  Who went

24   into the cell?

25   A.  Officer Ross and Bailey.

1    Q.  And you said that there was some talk back and forth?

2    A.  A few minutes, few seconds, few minutes.

3    Q.  And then what's the next thing you remember seeing?

4    A.  They grabbed him and they fell to the bed.

5    Q.  Who initiated the physical contact?

6    A.  I believe it was Officer Ross and Bailey.

7    Q.  Did you see Inmate Dais do anything before that contact was

8    initiated?

9    A.  No.

10   Q.  Did you continue to watch?

11   A.  No.

12   Q.  What did you do?

13   A.  I grabbed the radio, called the SERT team, started to

14   control the doors.

15   Q.  Now, you say you called the SERT team.  How did you call

16   them?

17   A.  Over the radio.

18   Q.  Did SERT team members respond?

19   A.  Yes.

20   Q.  How about -- about how long did that take?

21   A.  Two to three minutes.

22   Q.  And were you watching what was going on in the cell during

23   that time?

24   A.  No.

25   Q.  Let me show you what's been entered into evidence as

1    Exhibit 53 A.  Do you recognize what's in photograph Exhibit 53

2    A?

3    A.  Yes.

4    Q.  Can you tell us what this picture depicts?

5    A.  It's the control booth.

6    Q.  And is that the control booth you were in at this time?

7    A.  Correct.

8    Q.  And what is this cell here?

9    A.  5564.

10    Q.  And is that the cell that Ross and Bailey went in?

11    A.  Correct.

12    Q.  Now, you said that the SERT team arrived.  Do you recall

13    who from the SERT team?

14    A.  No.

15    Q.  What did you see happening when the SERT team showed up?

16    A.  Just believe they went in, restrained Inmate Dais.

17    Q.  Well, did you see what was going on in the cell?

18    A.  No, not really.  I wasn't paying attention.

19    Q.  How long did you stay in the booth?

20    A.  I know I went back to my assignment before 7:00.  I don't

21    know if I went back before.  I know I went back at 7:00.

22    Q.  And at any time did you see a restraint chair coming down

23    there?

24    A.  I believe so, yes.

25    Q.  And where was the restraint chair put?

1   A.  In cell -- I believe cell 5564.

2   Q.  Did you have anything to do with the -- putting the inmate

3   in the restraint chair?

4   A.  No, sir.

5   Q.  Now, this occurred on a Friday night, September 24th?

6   A.  Yes.

7   Q.  Sometime after this incident did you speak with Officer

8   Brian Bailey about it?

9   A.  I believe it was later that night.

10  Q.  And what did he say to you and what did you say to him as

11  best you can recall?

12  A.  I believe he told me, you know, it was -- what was in his

13  report, a medical emergency, you know, he came after him.  That

14  was it.

15  Q.  Now, you say he told you that.  How did he tell you that?

16  A.  What do you mean how did he tell?

17  Q.  Well, if you can best sort of summarize the conversation

18  with Mr. Bailey as best you can.

19  A.  Well, he might have told me what was in his report.

20  Q.  And what did he tell you he was putting in his report?

21  A.  I believe it was just a medical emergency and he came at

22  him, you know, that he stood up, came at -- came at him.

23  Q.  Now, did you know that that was true or untrue?

24  A.  It was untrue.

25  Q.  Were you interviewed by the Sheriff's Investigative

1    Division after that?

2    A.  Yes.

3    Q.  Do you recall by whom?

4    A.  Mark Kulik.

5    Q.  And were you asked questions about this incident?

6    A.  Yes.

7    Q.  And what did you tell him about the reason Bailey and Ross

8    went into Inmate Dais' cell?

9            MR. LOUISON:  Objection, your Honor.

10           THE COURT:  Sustained.

11           MR. MERRITT:  Your Honor --

12           THE COURT:  Come over here, please.

13           (At side bar on the record.)

14           THE COURT:  Yes?

15           MR. MERRITT:  Well, your Honor, this is not being

16   offered for the truth.  It's being offered to show that he went

17   along with what Bailey told him.

18           THE COURT:  He did?

19           MR. MERRITT:  Yes.

20           THE COURT:  All right.  Okay.

21           MR. SLAVITT:  Again, your Honor, I'd like a

22   limiting instruction at a minimum if the government is --

23           THE COURT:  Okay.

24           MR. LOUISON:  I think prejudice outweighs any

25   probative value the government is offering.  It goes directly

TOTAL P 2:

1    to -- and I don't think the limiting instruction is going to

2    cure the potential confusion.

3            THE COURT:  When I think about it, I don't know

4    that a limiting instruction is appropriate in any event.

5            MR. LOUISON:  You do not?

6            THE COURT:  No, because I assume it's being offered

7    as part of the evidence of a cover-up.

8            MR. MERRITT:  That's correct, your Honor.

9            THE COURT:  Okay.  You may have it.

10           (End of discussion at side bar.)

11   BY MR. MERRITT:

12   Q.  All right.  Mr. Murphy, I think the question was when you

13   were interviewed by Deputy Kulik what did you tell him the

14   reason was that Bailey and Ross went into the cell?

15   A.  That it was medical emergency.

16   Q.  What else did you tell him?

17   A.  That Inmate Dais came at him in a threatening matter.

18   Q.  Now, is it true that they went in because of a medical

19   emergency?

20   A.  No.

21   Q.  Was it true that Inmate Dais came in and attacked them?

22   A.  No.

23   Q.  Did you write a report after that?

24   A.  Correct.

25           MR. MERRITT:  May I approach the witness, your

1   Honor?

2         THE COURT:  Yes.

3   BY MR. MERRITT:

4   Q.  I place before you Government Exhibit 58.  Do you recognize

5   that?

6   A.  Yes.

7   Q.  What is that, Mr. Murphy?

8   A.  That's my report.

9   Q.  Is that the report you submitted to SID?

10   A.  Correct.

11         MR. MERRITT:  Your Honor, I move in Exhibit 58.

12         THE COURT:  Any objection?

13         MR. LOUISON:  No, your Honor.

14         THE COURT:  56 is admitted.

15         MR. SLAVITT:  I'm sorry, what number, your Honor?

16         THE COURT:  56.

17         MR. MERRITT:  58, I believe.

18         THE COURT:  I'm sorry, 58.  Sorry.

19         (Exhibit 58 received into evidence.)

20   BY MR. MERRITT:

21   Q.  All right.  Mr. Murphy, I placed on the screen -- is that

22   page one of Exhibit 58?

23   A.  Correct.

24   Q.  And if I can ask you to just read along to the -- read your

25   writing to the jury.

1  A.  The whole report?

2  Q.  Yes.

3  A.      "On the above day and time while assigned to the

4          medical control while entering the psych

5          control" --

6          THE COURT:  Mr. Murphy, I'm going to ask you to

7  start again.  Read slowly and keep your voice up, please.

8          THE WITNESS:  Okay.

9  A.      "On the above day and time while assigned to the

10         medical control while entering the psych control to

11         relieve Officer Ross for dinner I observed Inmate

12         Dais yelling you punched me in the head and also

13         kicking his door.  When he" --

14         THE COURT:  Please, please, slowly, slowly.

15 A.      "While Officer Bailey was doing a round of the unit

16         he noticed Inmate Dais lying on the floor.  Before

17         entering the room to check on Inmate Dais Officer

18         Bailey asked Officer Ross to stand by while

19         entering the room to check on Inmate Dais.  Inmate

20         Dais stood up and began yelling and approaching

21         Officer Ross and Bailey in a threatening manner.

22         At this time I called the SERT team to the psych

23         unit.  Officer Bailey and Ross proceeded to

24         restrain Inmate Dais.  SERT arrived and cuffed

25         Inmate Dais.  While cuffed Inmate Dais still

1          remained uncooperative.  SERT then proceeded to

2          place inmate dais in the chair."

3     Q.  Now, Mr. Murphy, the part that you wrote in there about --

4     that Officer Bailey noticed Inmate Dais lying on the floor, was

5     that true?

6     A.  No.

7     Q.  And the part that you wrote in there:

8          "While entering the room to check on Inmate Dais,

9          Inmate Dais stood up and began yelling and

10         approaching Officer Ross and Bailey in a

11         threatening manner."

12         Was that true?

13    A.  No.

14    Q.  Now, I'm also going to place before you what's been

15    admitted as Government Exhibit 55, which I think you can see up

16    on the screen.

17         Is this the report for Officer Bailey for that

18    incident.

19    A.  Yes, I believe so.

20    Q.  And drawing your attention to this section here, where it

21    says:

22         "At 6:30 Officer Murphy relieved Officer Ross for

23         dinner.  Before Officer Ross left he waited for me

24         to finish my round.  As I approached Inmate Dais'

25         cell the inmate fell to the ground choking."

```
 1              Is that true?

 2   A.  I didn't see that.

 3   Q.  Well, I asked you: did it happen?

 4   A.  No.

 5   Q.        "And shaking.  As I observe this I hit my alarm and

 6              asked Officer Ross to assist me.  As I approached

 7              the inmate he got up and started throwing punches

 8              at me."

 9              Was that true?

10   A.  No.

11   Q.        "After the inmate was placed in cuffs the inmate

12              became more violent and verbally threatening

13              towards the officers.  The inmate kept throwing

14              himself off the bunk."

15              Did you see that happen?

16   A.  I didn't see it.

17              (Discussion off the record.)

18   BY MR. MERRITT:

19   Q.  Mr. Murphy, why did you write a false report and lie to SID

20   about what happened in the cell?

21              MR. SLAVITT:  Objection.

22              THE COURT:  Overruled.

23   A.  I can answer that?

24   Q.  Yeah.

25   A.  I wanted to cover-up.  I didn't want to -- you know, I
```

1    couldn't rat these guys out.

2    Q.   In December of 2000 did you become aware the FBI was

3    investigating this incident?

4    A.   Yes, when they showed up at my door.

5    Q.   And were you interviewed by two FBI agents?

6    A.   Yes, two female FBI agents.

7    Q.   Did you tell them the truth?

8    A.   No.

9    Q.   What did you do?

10   A.   I stuck to my report.

11   Q.   After that did you get a subpoena to appear before a

12   federal grand jury?

13   A.   Correct.

14   Q.   Was that in January of 2001?

15   A.   Correct.

16   Q.   And prior to the grand jury appearance did you meet with

17   the agents again, prosecutor?

18   A.   Yes.

19   Q.   And were you told anything about the grand jury?

20   A.   Yes.

21   Q.   What were you told?

22   A.   That I could plead the fifth or tell the truth.  An option

23   wasn't -- lying wasn't an option.

24   Q.   And were you given a proffer letter at that time?

25   A.   Correct.

1    Q.  Did you ask for it?

2    A.  No.

3    Q.  What did you understand that letter, the terms to be?

4    A.  That my testimony couldn't be used against me, but if I was

5    involved in other incidents I could still be prosecuted.

6    Q.  Were any other representations made to you by the

7    government about what they would do?

8    A.  They said they'd notify my job and tell them about my

9    truthful cooperation.

10                MR. MERRITT:  No further questions, your Honor.

11                THE COURT:  Mr. Pfaff?

12                MR. PFAFF:  Thank you, your Honor.

13                        CROSS EXAMINATION

14   BY MR. PFAFF:

15   Q.  Good morning, Mr. Murphy.

16   A.  Good morning.

17   Q.  Mr. Murphy, you testified earlier that your function as a

18   correctional officer is care and custody, control of inmates;

19   is that correct?

20   A.  Correct.

21   Q.  And you've seen Officer Bethune, have you not, during the

22   course of your career?

23   A.  Yes.

24   Q.  And you do know that he has a reputation for truthfulness

25   and patience, do you not?

1          MR. MERRITT:  Objection, your Honor.  Form of the

2     question.

3          THE COURT:  Sustained.

4     BY MR. PFAFF:

5     Q.  You do know that Mr. Bethune has a reputation for patience

6     with inmates, correct?

7     A.  I believe so.

8          MR. PFAFF:  Thank you.  Nothing further.

9          MR. LOUISON:  If I may, your Honor.

10         Good morning, ladies and gentlemen.

11         THE JURY:  Good morning.

12                    CROSS EXAMINATION

13     BY MR. LOUISON:

14     Q.  Good morning, Mr. Murphy.  Just a few questions.

15         You were talking about being assigned to the

16     medical unit back in September of 1999, which is the fact

17     pattern that you were just talking about, correct?

18     A.  Correct.

19     Q.  And you talked about being assigned there because of a

20     rupture to your Achilles tendon.  Did I get that correct?

21     A.  Yeah, in '95.

22     Q.  Now, were you on light duty?

23     A.  Yes.

24     Q.  Would you describe briefly for the Court and jury what

25     light duty is or was back then?

1    A.  I just got different assignments.  No inmate contact.

2    Q.  And is it fair to say that afforded you the ability, even

3    though were you recovering from some physical ailment, gave you

4    the opportunity to continue working in the jail?

5    A.  Correct.

6    Q.  And by light duty did you have lighter job requirements

7    than a regular JO assignment?

8    A.  Yes.

9    Q.  Okay.  And that was -- was that -- is it fair to say that

10   the medical unit was -- some of the assignments there were

11   light-duty assignments?

12   A.  Correct.

13   Q.  Yes?

14   A.  Correct.

15   Q.  Okay.  And were you aware in October of 1999, about a month

16   or so later, Jail Officer Bill Benson was assigned there?

17   A.  Yeah -- I don't recall.

18   Q.  Okay.  You don't have a specific recollection.

19   A.  No.

20   Q.  Do you have a recollection as you sit here today that

21   during that period of time Benson was on light duty, as you

22   were, in the med unit?

23   A.  I believe he was at one point.

24   Q.  Okay.  That is your understanding?

25   A.  I believe so.

1    Q.   Are you familiar with Billy Benson?

2    A.   Just to say hi to.

3    Q.   And are you familiar with his reputation within the jail

4    for peacefulness and non-violence?

5    A.   Yes.

6    Q.   And what is your understanding of his reputation?

7    A.   You know, I couldn't -- you know --

8    Q.   Is it a non-violent reputation is it your understanding?

9    A.   Yes.

10   Q.   Yes?

11   A.   I believe so.

12   Q.   And peaceful with inmates?

13   A.   Yeah.

14   Q.   Okay.  Now, describing and stepping back for a moment to

15   the med unit, that's the 5-5 unit; is that fair to say?

16   A.   Correct.

17   Q.   Now, briefly for the jury and Court is it fair to say that

18   on the medical side of that floor is a storage area for medical

19   supplies?

20   A.   Yes.

21   Q.   Is there a room next to the medical booth where nurses come

22   in and out can get supplies and other materials?

23   A.   At that time, yes.

24   Q.   Yes.  And did you say at that time?

25   A.   Yeah.  I don't believe it still is.

1  Q.  Okay.  But, yes, actually, just talking about at that time

2  in October of 1999.

3  A.  Yes.

4  Q.  It was your understanding that there was a room on the med

5  side near the med booth where the nurses within the facility

6  could come and go to get supplies.

7  A.  Correct.

8  Q.  And on the 3:00 to 11:00 shift did you have an

9  understanding of how many nurses would generally be on duty or

10  working within the jail?

11  A.  No, I didn't.

12  Q.  Was it more than one?

13  A.  I believe so.

14  Q.  Okay.  But you don't have a specific number?

15  A.  No.

16  Q.  Now, at the time in the med unit, unless the inmates or the

17  detainees were locked down in their room, were they generally

18  able to walk within the medical side of the med unit?

19  A.  Correct.

20  Q.  Okay.  And would that include ability to walk near or about

21  where that medical supply room is or was?

22  A.  Yes.

23  Q.  Okay.  And if -- and, therefore, if nurses coming in and

24  out would have to -- nurses coming in and out to get to that

25  med supply room would by necessity pass by other detainees if

1    they're out on the floor?

2    A.  Correct.

3    Q.  Okay.  Now, this incident that you just described that

4    happened on or around September 1999 had nothing whatsoever to

5    do with Billy Benson, correct?

6    A.  No.

7    Q.  Even though Billy Benson was on the med floor sometime

8    later, nothing you described had anything to do with him.

9    A.  No.

10              MR. LOUISON:  Okay, thank you.

11                   CROSS EXAMINATION

12              MR. SLAVITT:  Good morning everybody.

13              THE JURY:  Good morning.

14                   CROSS EXAMINATION

15   BY MR. SLAVITT:

16   Q.  Good morning, sir.  My name is Evan Slavitt, and I

17   represent Mr. Bailey in this matter.

18              First, a little administrative question.  Do you

19   still have Exhibit 80 in front of you?

20   A.  What number?

21   Q.  80.  It's the logbook for Friday, September 24, 1999.

22   A.  Yes.

23   Q.  Could you just clear something up for me?  Can you look

24   down at the entry for 5:20 it looks like?  Do you see that?

25   A.  Correct.

1  Q.  And it identifies that Mr. Bailey and somebody named

2  Manning were on first dinner?

3  A.  Yes.

4  Q.  And then the second dinner was you and Mr. Ross at the same

5  time at 6:00.

6  A.  Correct.

7  Q.  Were you and Mr. Ross, in fact, on the same dinner cycle?

8  A.  No, they must have -- no.

9  Q.  No.  So, in fact, you were on at 6:00 and then you came up

10  to relieve Mr. Ross at 6:30.

11  A.  Correct.

12  Q.  Okay.  Now, when you came up to relieve Mr. Ross who was in

13  the psych control booth somebody -- either Mr. Ross or

14  Mr. Bailey -- said that they were going into the cell, correct?

15  A.  Correct.

16  Q.  Okay.  And you don't recall who said that.

17  A.  No, sir.

18  Q.  And you were concerned because that's against regulations.

19  A.  Yes.

20  Q.  Okay.  And Mr. Ross, in fact, was the one who went in

21  first, correct?

22  A.  I don't remember.

23  Q.  Okay.  But, in any event, you said that they went in and

24  you saw them talking for a couple of minutes, right?

25  A.  I believe so.

1   Q.  So they were standing there talking for a little while,

2   right?

3   A.  Yes.

4   Q.  Okay.  So time passes a little bit, and then what you saw

5   next was you saw that they attempted to restrain Mr. Dais and

6   he went down to the bed.

7   A.  They grabbed him, they fell on the bed.

8   Q.  Okay.  Now, from where you were standing you were looking

9   at Mr. Bailey's back I take it?

10  A.  Correct.

11  Q.  And past him you were looking toward -- sort of around the

12  corner to Mr. Ross and Mr. Dais?

13  A.  No.

14  Q.  In other words, Mr. Dais was against the sort of back

15  against the window, correct?

16  A.  I don't remember where -- you know, how far he was back.

17  Q.  Well, I guess my question is Mr. Ross and Mr. Bailey's back

18  were to you while you were in the psych control booth, correct?

19  A.  Correct.

20  Q.  And Mr. Bailey, in fact, was between you and Mr. Ross,

21  right?  He was standing closer to the door.

22  A.  I don't recall.

23  Q.  So what you saw was Mr. Bailey standing there for a little

24  while, while Ross was talking to Dais, and then you saw the two

25  of them put Mr. Dais on the bed.

1    A.  I believe -- yeah.  I just know they fell on the bed.  I

2    don't -- you know.

3    Q.  By the way, when was the last time you spoke to the United

4    States about your testimony before coming here today?

5    A.  Today's date --

6    Q.  Today would be Monday.

7    A.  Last Friday.

8    Q.  Okay.  You went over what you were going to say?

9    A.  Correct.

10   Q.  They practiced with you, asked you some questions --

11   A.  Yes.

12   Q.  Now -- then you said the restraint chair came in, right?

13   A.  Yes.

14   Q.  Okay.  That's a decision of the supervisor, correct?

15   A.  Correct.

16   Q.  Blue shirts have nothing to do with that decision, right?

17   A.  No.

18   Q.  Now, a little later on you said that Mr. Bailey came along

19   and told you what was going to be in his report, correct?

20   A.  I believe so.

21   Q.  All right.  I just want to be very clear.  Where were you

22   at the time?

23   A.  I believe I was in the medical control booth.

24   Q.  Mr. Bailey comes by, correct?

25   A.  I believe so.

1    Q.  He simply tells you what he is putting in his report,

2    correct?

3    A.  Yes.

4    Q.  And then he leaves.

5    A.  Yes.

6    Q.  Okay.  That was the extent of the conversation.

7    A.  I believe so.

8    Q.  And then your report isn't dated until the 28th, correct?

9    A.  Correct.

10    Q.  So you wrote it over the weekend or when you came in on the

11    next shift?

12    A.  The day I got interviewed by Deputy Kulik.

13    Q.  Okay.  And then you decided what you were going to put in

14    the report.

15    A.  Yes.

16    Q.  Okay.  And you wrote medical emergency.

17    A.  Yes.

18    Q.  Now, just so I'm clear, how old are you?

19    A.  Thirty-nine.

20    Q.  And how long -- at this point in 1999 how long had you been

21    working at the Nashua Street Jail?

22    A.  Seven years maybe, seven --

23    Q.  And you're still working there?

24    A.  Correct.

25    Q.  Not suspended?

1   A.  No.

2   Q.  Not fired?

3   A.  No.

4   Q.  And I believe you were asked some questions on direct about

5   being trained on the use of excessive force?

6   A.  Correct.

7   Q.  Okay.  Is it fair to say that your understanding of your

8   training was that excessive force is when the incident is over

9   and you keep using force, that's excessive?

10  A.  Correct.

11  Q.  Such as after -- such as after the point at which an

12  inmate, for example, can be handcuffed?

13  A.  Excuse me?

14  Q.  That would be after the inmate, for example, has been

15  handcuffed, now the incident is over?

16  A.  Correct.

17          MR. SLAVITT:  I have nothing further, your Honor.

18          MR. MERRITT:  Just a few, your Honor.

19          THE COURT:  Yes.

20                  REDIRECT EXAMINATION

21  BY MR. MERRITT:

22  Q.  You were asked on cross-examination whether you were

23  concerned that Bailey and Ross going into the cell was against

24  regulations.  Did you have another concern?

25          MR. SLAVITT:  Objection, your Honor.  That was not

1  the question I asked.

2                    THE COURT:  Sustained.

3  BY MR. MERRITT:

4  Q.  Well, did you have any other concerns besides the

5  regulations?

6                    MR. SLAVITT:  Objection.

7                    THE COURT:  Sustained.

8  BY MR. MERRITT:

9  Q.  Just so we understand, you wrote your report when in

10  relation to your interview with Deputy Kulik?

11  A.  I believe that night after he interviewed me.

12  Q.  And you were asked the question, I think, to the effect you

13  decided what to put in your report.  Do you recall that

14  question?

15  A.  Yes.

16  Q.  Why did you decide to put those false stories in your

17  report?

18  A.  To cover up.

19  Q.  And, as far as you know, Mr. Murphy, is this the first time

20  that your testimony has been made known publicly?

21                    MR. LOUISON:  Objection.

22                    THE COURT:  Sustained.

23  BY MR. MERRITT:

24  Q.  Well, do you have any reason to believe that the Sheriff's

25  Department knows what your testimony was before today?

1      MR. LOUISON:  Objection.

2      THE COURT:  Sustained.

3   BY MR. MERRITT:

4   Q.  Well, do you expect now that you've given public testimony

5   that there may be disciplinary proceedings?

6   A.  Correct.

7      MR. MERRITT:  Thank you, your Honor.

8      THE COURT:  Any further questions?

9      MR. PFAFF:  Yes, your Honor.

10                    RECROSS EXAMINATION

11  BY MR. PFAFF:

12  Q.  Mr. Murphy, the fact that an inmate is handcuffed doesn't

13  mean that he no longer poses a threat; is that correct?

14      MR. MERRITT:  Objection, your Honor, scope.

15      THE COURT:  You may have it.

16  BY MR. PFAFF:

17  Q.  The question is:  The fact that an inmate is handcuffed,

18  that doesn't mean that he doesn't pose a threat, does he?

19  A.  Right.

20  Q.  So he can still pose a threat?

21  A.  Yes.

22  Q.  So you can use force on an inmate, put handcuffs on an

23  inmate that still poses a threat to another's safety, another

24  officer's safety?

25  A.  Correct.

1          MR. PFAFF:  Nothing else.

2            RECROSS EXAMINATION

3  BY MR. LOUISON:

4  Q.  Mr. Merritt just asked you about possible disciplinary

5  action taken by the sheriff's office.  Your expectation, is it

6  not correct, if discipline is brought you expect the U.S.

7  Attorney's office to write a letter to the Sheriff's Department

8  telling them about your now cooperation.

9  A.  They never mentioned a letter to me.

10  Q.  Okay.  Communicate to the office.

11  A.  Communicate.

12  Q.  Okay.  Just so we're clear, you testified about -- that

13  expectation back when you went before the grand jury that your

14  expectation was that they would communicate, the U.S. attorneys

15  that are involved in this case would communicate your then

16  truthful or cooperation with the sheriff's office in the event

17  you get disciplined.

18  A.  Correct.

19          MR. LOUISON:  Thank you.

20          MR. SLAVITT:  I have nothing, your Honor.

21          THE COURT:  Mr. Murphy, thank you very much.

22  You're excused.

23           - - - - - - -

24            CERTIFICATION

25      I certify that the foregoing is a correct

1    transcript of the record of proceedings in the above-entitled

2    matter to the best of my skill and ability.

3

4

5

6    _____        _____

7    Debra M. Joyce                   Date

8    Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    EXAMINATION INDEX

 2
   BRIAN MURPHY
 3       DIRECT BY MR. MERRITT                      3
         CROSS BY MR. PFAFF                        26
 4       CROSS BY MR. LOUISON                      27
         CROSS BY MR. SLAVITT                      31
 5       CROSS BY MR. SLAVITT                      31
         REDIRECT BY MR. MERRITT                   36
 6       RECROSS BY MR. PFAFF                      38
         RECROSS BY MR. LOUISON                    39

 7

 8
                      EXHIBIT INDEX
 9
                                        MAR  /  ADM
10 Government
     58                                           21
11
     80                                            8
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```